**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

KTF/VAZ/EWS
F. #2015R00747

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

August 12, 2026

By ECF & E-mail

The Honorable Pamela K. Chen
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Juan Ángel Napout et al.
Criminal Docket No. 15-252 (S-3) (PKC)

Dear Judge Chen:

The government respectfully submits this letter in opposition to the *coram nobis* petitions filed by the following convicted defendant-petitioners (the "petitioners"):

- Juan Ángel Napout, *see* ECF Nos. 2035 ("Napout Br."), 2089, and 2111;
- Jose Maria Marin (now deceased), *see* ECF Nos. 2036 ("Marin Br."), 2050, 2051, 2089, 2101, 2109, and 2110;
- Alfredo Hawit, *see* ECF Nos. 2037 ("Hawit Br."), 2067, 2089, 2100, and 2112;
- Eduardo Li, *see* ECF Nos. 2040 ("Li Br."), 2041, 2066, 2089, and 2108; and
- Reynaldo Vasquez, *see* ECF No. 2113 ("Vasquez Br.").

For the reasons set forth below, the Court should deny *coram nobis* relief as to all five petitioners. There are numerous threshold and procedural bases to deny the petitions, including that Vasquez waived the right to file this petition in his plea, Marin's claims were mooted upon his death, the petitions were all untimely, and the petitioners do not satisfy their burdens of articulating sufficient ongoing legal harms.

As to the merits, the Court should deny Napout and Marin's petitions because the Second Circuit case deciding their trial appeals is still good law, and, relatedly, the Court should adopt the persuasive-authority reasoning of the Second Circuit's now-vacated decision in *United*

*States v. Lopez*, 143 F.4th 99, 102 (2d Cir. 2025), *cert. granted and judgment vacated sub nom. Full Play Grp., S.A. v. United States*, 146 S. Ct. 1471 (2026). But even if the Court disagrees with the reasoning of *Lopez*—and the government's submissions in that appeal—there remain ample bases on which the Court should deny the petitions, including that all petitioners were convicted of crimes (such as racketeering conspiracy) involving the bribery of executives of a U.S.-based soccer organization that fall outside of the ambit of the Court's original acquittal order, all petitioners were also charged with a classic theory of wire fraud for which there is ample evidence in the record, and some petitioners are convicted of other crimes that make *coram nobis* unavailable.

## I. Background

### A. The Scheme

As the Court knows, this case revealed a decades-long scheme to bribe some of the most powerful men in soccer, using U.S. wires and through the U.S. financial system, to obtain lucrative media rights to the world's most popular sport.

The relevant media rights were owned by nonprofit soccer organizations—including Fédération Internationale de Football Association ("FIFA") and its member confederations, such as the Confederation of North, Central America and Caribbean Association Football ("CONCACAF"), which at all relevant times was headquartered in the United States, and the Confederación Sudamericana de Fútbol ("CONMEBOL"), and national associations (called "federations")—but in fact were controlled by a small number of powerful men who formed the organizations' executive teams. Rather than selling these rights in a fair and free market to the highest bidder as the organizations expected, the corrupt soccer executives accepted bribes from co-conspirators, enriching themselves personally at the expense of the organizations they were duty-bound to serve.

The bribery scheme benefited co-conspirators and their own companies, while stymieing legitimate market competition and corrupting the sport. Organizational victims suffered losses totaling hundreds of millions of dollars. *See* ECF No. 1725 at 1.

For their bribery, each of the petitioners was charged with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), and which contemplated predicate acts including wire fraud—both on a classic theory and an honest-services theory—money laundering and money laundering conspiracy, Travel Act violations, obstruction of justice and obstruction of justice conspiracy, and bribery under New York and New Jersey state law. *See, e.g.*, S-1 Ind. ¶¶ 362-63; *see also, e.g., id.* ¶ 502 (alleging, as to wire fraud conspiracy count, that defendants conspired "to devise a scheme and artifice to defraud FIFA, CONCACAF, arid CONMEBOL and their constituent organizations, including to deprive FIFA, CONCACAF, and CONMEBOL and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises"). Members and associates of the contemplated enterprise committed several other crimes as well, including tax fraud and fraud in connection with obtaining U.S. citizenship. *Id.* ¶¶ 506, 508.

In total, over 50 individuals and companies were charged in connection with the case. Most defendants pleaded guilty to their crimes and allocuted to their conduct. Six defendants went to trial; four were convicted by jury. Some successfully fought extradition or are still fighting extradition and remain abroad. As a result of the case, more than $201 million of forfeited funds have been remitted back to victim organizations. *See* ECF No. 1725 at 1.

B. The Petitioners

Before the Court are five *coram nobis* petitions, filed by bribe-receiving soccer executives in this racketeering scheme.

During the scheme, Juan Ángel Napout was a soccer executive of FIFA, CONMEBOL, and Paraguay's soccer federation (a CONMEBOL member). Jose Maria Marin was a soccer executive of Brazil's soccer federation (a CONMEBOL member). Alfredo Hawit was a soccer executive of CONCACAF and Honduras' soccer federation (a CONCACAF member). Eduardo Li was a soccer executive of CONCACAF and Costa Rica's soccer federation (a CONCACAF member) and an executive-elect of FIFA. Reynaldo Vasquez was a soccer executive of El Salvador's soccer federation (another CONCACAF member).

Hawit, Li, and Vasquez all pleaded guilty to one or more crimes. Napout and Marin were convicted at trial. In describing their conduct below, the government relies on the petitioners' charging instruments, plea allocutions, and Presentence Investigation Reports ("PSRs").

C. The Petitioners Who Pleaded Guilty: Hawit, Li, and Vasquez

1. Alfredo Hawit

As set forth in ¶¶ 16 to 32 of his PSR, Alfredo Hawit was general secretary of the Federación Nacional Autonoma de Futbol de Honduras ("FENAFUTH"), the Honduran soccer federation, and the president, acting president, and executive committee member of CONCACAF during the scheme. Hawit engaged in bribery in connection with media rights for regional World Cup qualifiers for the Unión Centramericana de Fútbol ("UNCAF") (the Central American regional federation and a FIFA member), certain FENAFUTH friendly matches, and certain CONCACAF tournaments, such as the Gold Cup. When he learned about the instant case, Hawit later attempted to obstruct justice by meeting with a Florida-based co-conspirator in Texas and having him create sham contracts to hide the true nature of certain bribes.

Hawit was arrested in Switzerland on December 3, 2015, when the Superseding Indictment was unsealed. He was extradited to the United States and arraigned on the Superseding Indictment on January 13, 2016.

On April 11, 2026, Hawit pleaded guilty to racketeering conspiracy, two counts of wire fraud conspiracy, and obstruction of justice conspiracy before the Honorable Raymond J. Dearie, United States District Judge, pursuant to a plea agreement. *See* Hawit Plea Agmt. At the hearing, Hawit acknowledged that he carefully reviewed with counsel and understood every provision of his agreement, that he agreed with all the provisions, and that he agreed to forfeit

$950,000. *See* Hawit Plea H'rg Tr., 10-12, 24-25. Relevant here, Judge Dearie read the racketeering conspiracy allegation in ¶ 363 and explained to Hawit that the charged conspiracy lasted from 1991 to the date of the Superseding Indictment, and that the contemplated pattern of racketeering acts "consisted of multiple acts indic[t]able under" 18 U.S.C. §§ 1512, 1343, 1952, 1956, and 1957 and "[m]ultiple acts involving bribery in violation of" N.Y. Penal Law §§ 180.03 and 180.08 and N.J. Stat. § 2C:21-20. *Id.* at 12-13. As to the wire fraud conspiracy counts, Judge Dearie read ¶¶ 65 and 92 of the Superseding Indictment and advised Hawit, among other things, that the conspiracies contemplated depriving FIFA and CONCACAF of not only their rights to honest and faithful services and but also money and property. *See id.* at 14-16. Finally, Judge Dearie read ¶ 92 of the Superseding Indictment and advised Hawit that the obstruction of justice conspiracy occurred in July 2015 and involved witness tampering and preventing communication to the Federal Bureau of Investigation ("FBI"). *See id.* at 16-17.

Hawit admitted that he was guilty of all four described counts. *See id.* at 25-26. He stated, among other things, that:

- From 1998 to December 2015, an association-in-fact comprising FIFA, CONCACAF, other soccer associations, and sports marketing companies was promoting and regulating the world of soccer;

- From 1998 to December 2015, Hawit served variously as a soccer executive in FIFA, CONCACAF, and Honduras' soccer federation and owed fiduciary duties to all three organizations;

- From 1998 to December 2015, CONCACAF was headquartered in the United States;

- From 2008 to 2013, Miami, Florida-based sports marketing company Media World, LLC ("Media World") bought certain marketing rights to 2014, 2018, and 2022 World Cup qualifiers, and Hawit accepted hundreds of thousands of dollars in bribes from Media World as part of those negotiations;

- Hawit received the bribe payments from intermediary accounts controlled by a co-conspirator in Florida;

- Hawit understood that the U.S. banking system was involved in the funding of the bribe payments;

- In 2011, a co-conspirator in Florida invited Hawit to a meeting in Argentina that later resulted in discussions where he agreed (unsuccessfully) to have CONCACAF award marketing rights to an Argentina-based sports marketing company in exchange for hundreds of thousands of dollars in bribes;

- Hawit's family members received approximately $200,000 in bribes from the co-conspirator in Florida on behalf of the Argentina-based sports marketing company; and

- In July 2015, while knowing that this case was ongoing, Hawit met with the above-described Florida-based co-conspirator in Houston, Texas to advise him to deceive FBI agents and to create a sham contract to mask the nature of the $200,000 in bribe payments, as well as other sham contracts to mask the nature of related bribes to other CONCACAF officials.

*See id.* at 26-31. Hawit confirmed that all his statements were true and correct. *See id.* at 33. Judge Dearie found that the plea was made knowingly and voluntarily. *See id.* at 33-34.

The Court later sentenced Hawit to concurrent terms of time served, two years of supervised release, forfeiture of $950,000, assets in three bank accounts, and various real properties, and a $400 special assessment. Final judgment was entered on June 30, 2020. *See* ECF No. 1404; *see also* ECF No. 1406.

2. Eduardo Li

As set forth in ¶¶ 15 to 32 of his PSR, Eduardo Li was the president of Federación Costarricense de Fútbol ("FEDEFUT"), the Costa Rican soccer federation, an executive committee member of CONCACAF, and an executive committee member-elect of FIFA. Li engaged in bribery in connection with media rights to certain UNCAF regional World Cup qualifiers and certain FEDEFUT friendly matches, the advertising rights for billboards at FEDEFUT-sponsored soccer matches, and uniform sponsorship rights associated with the Costa Rican national soccer team. Li also embezzled $93,000 in funds provided by FIFA to fix a stadium damaged by a Costa Rican earthquake and to support the women's Under 17 World Cup tournament organized by FEDEFUT.

Li was arrested in Switzerland on May 27, 2015, when the original Indictment was unsealed. He was extradited to the United States and arraigned on the Indictment on December 18, 2015.

On October 7, 2016, Li pleaded guilty to racketeering conspiracy, wire fraud, and wire fraud conspiracy before this Court pursuant to a plea agreement. *See* Li Plea Agmt. Li acknowledged that he reviewed and understood the terms of the agreement. *See* Li Plea H'rg Tr. 13. His counsel acknowledged that he agreed to forfeiture of $668,000. *See id.* at 32-33. Relevant here, the Court advised Li that the racketeering conspiracy lasted from 1991 to the date of the Superseding Indictment; that Li "and the other members of the enterprise conduct[ed] activities that violated laws," such as "engaging in wire fraud and includ[ing] honest services wire fraud," money laundering and money laundering conspiracy, interstate and foreign travel in aid of racketeering, and obstruction of justice conspiracy; and that enterprise members "were involved in acts involving bribery" in violation of New York and New Jersey state law. *Id.* at 7-10. Li confirmed that he "underst[ood] the nature of the charge." *Id.* at 8. As to the wire fraud conspiracy count, the Court identified Count Fifty-Eight of the Superseding Indictment and advised Li, among other things, that the fraud "scheme involved bribes and kickbacks and also obtaining money and property." *Id.* at 9.

Li admitted that he was guilty of all three described counts. *See id.* at 20. He stated, among other things, that:

- From 2007 to May 2015, an association-in-fact comprising FIFA, CONCACAF, other soccer associations, and sports marketing companies was promoting and regulating the world of soccer;
- From 2007 to May 2015, Li served variously as a soccer executive of CONCACAF and Costa Rica's soccer federation and owed a fiduciary duty to both organizations and FIFA;
- From 2007 to May 2015, CONCACAF was headquartered in the United States;
- In 2014, Miami-based sport marketing company Traffic entered into a contract to purchase certain media rights to the 2022 World Cup qualifiers, and Li agreed to receive approximately a $500,000 bribe for the contract;
- Li received $300,000 of the agreed-upon $500,000 payment and directed the $300,000 be sent by Traffic to a Florida-based bank account of a company owned by Li's business partner, on Li's behalf;
- In April 2015, $150,000 of the $350,000 was transferred from a Miami-based bank account owned by Media World to a Panama-based bank account owned by an intermediary (consistent with the wire fraud charge specified in Count Twenty-Two);
- Li understood that the U.S. banking system was involved in the funding of the bribe payments;
- A Florida-based co-conspirator sent Li tens of thousands of dollars in bribe payments by U.S.-based wire transfer, in exchange for scheduling certain friendly matches;
- An American company secured a sponsorship contract with the Costa Rican national soccer team, and Li agreed to receive a $500,000 bribe from a U.S.-based employee of the American company as part of the negotiations;
- Li received $230,000 of the agreed-upon $500,000 bribe in 2014 and 2015; and
- Li "embezzled" for his own benefit more than $90,000 of money obtained from FIFA to support a 2014 Under 17 Women's World Cup tournament, which was held in Costa Rica.

*See id.* at 22-31. Li confirmed that all his statements were true and correct. *See id.* at 33. The Court found that the plea was made knowingly and voluntarily. *See id.* at 13-14, 21, 31.

The Court later sentenced Li to concurrent terms of time served, with two years of supervised release, a $15,000 fine, forfeiture of $668,000 and assets in two bank accounts, $1,839,488.78 in restitution, and a $300 special assessment. Final judgment was entered on December 6, 2018. *See* ECF No. 1131; *see also* ECF Nos. 442-1, 1209.

3. Reynaldo Vasquez

As set forth in ¶¶ 12 to 28 of his PSR, Reynaldo Vasquez was the president of the Federación Salvadoreña de Futbol ("FESFUT"), the Salvadoran soccer federation, CONCACAF, and the Central American Football Union ("UNCAF"). He participated in two bribery schemes.

The first related to World Cup qualifiers for FESFUT. In or about 2012, Media World paid a six-figure bribe payment to obtain rights owned by FESFUT to its 2018 World Cup qualifier matches. To obtain the contract, Media World agreed to pay a bribe to Vasquez and others using a Panamanian company controlled by a co-conspirator ("CC-1") to launder the bribe payment. Media World wired $350,000 from its Bank of America account in Miami to CC-1's Citibank account in Panama. Approximately $340,000 were then wired from CC-1's account in Panama to an account in the name of Vasquez. The payment was to be split between Vasquez, the incoming FESFUT president, Vasquez's predecessor and other members of the federation's executive committee. Vasquez, who by this time was the former president of FESFUT but nevertheless retained influence over current federation officials, kept some of the funds himself and provided a portion of the money back to a Media World employee ("CC-2"), who delivered it to the then-current president of FESFUT, as Vasquez instructed.

The second bribery scheme in which Vasquez participated related to international friendly matches between the Salvadoran men's national team and the teams of other FIFA member associations. To induce FESFUT to participate in these matches, CC-1 and CC-2 agreed to pay, and did pay, bribes to Vasquez, at this point a former FESFUT federation president who retained influence over FESFUT affairs, as well as to two then-current FESFUT officials ("Official 1" and "Official 2"). Many of the friendly matches were played in the United States, including in Houston, Dallas, Washington D.C., Fort Lauderdale, and Harrison, New Jersey, and some of the bribes were paid through U.S.-based financial institutions.

On or about September 2, 2015, after the original indictment in this case had been unsealed, laying bare bribery schemes in international soccer, CC-2 met with Official 2 in Miami, Florida. During the meeting, Official 2 asked CC-2 about the bribe. CC-2 said, in sum and substance, that he thought he was not sure he could obtain approval for the payment. Thereafter, in September 2015, Vasquez sent a letter to CC-2 in Miami, Florida, scolding CC-2 for failing to make bribe payments even though the indictment had been unsealed.

Vasquez was arrested in El Salvador on December 16, 2015, days after the Superseding Indictment was unsealed. While fighting extradition, Vasquez faced unrelated embezzlement charges in El Salvador. In March 2017, Vasquez was sentenced by a Salvadoran court to eight years' imprisonment for those embezzlement crimes. He completed his foreign sentence on June 7, 2020, after receiving credit for the extradition-related detention. *See* ECF No. 1817 at 7-8. Vasquez remained detained until he was extradited to the United States on the sole count of racketeering conspiracy on January 29, 2021. He was arraigned that day on the racketeering conspiracy count of the Third Superseding Indictment.

Vasquez pleaded guilty to the sole count pursuant to a plea agreement. *See* Vasquez Plea Agmt. In exchange for various promises offered by the government, Vasquez agreed "not to file an appeal or otherwise challenge, by petition to 28 U.S.C. § 2255 or any other provision, the conviction or sentence in the event that the Court imposes a term of imprisonment of 46 months or below." Vasquez Plea Agmt. ¶ 4. Vasquez "further waive[d] the right to raise on appeal or on collateral review any argument that (1) the statute to which the defendant is pleading guilty is unconstitutional and (2) the admitted conduct does not fall within the scope of the statute." *Id.* He agreed "not to file or interpose any claim or petition, or to assist others to file or interpose any claim or petition, seeking return of the Forfeited Assets or any property against which the government seeks to execute the Forfeiture Money Judgment in any administrative or judicial proceeding." *Id.* ¶ 10. And he agreed that he "knowingly and voluntarily waive[d] his right, if any, to a jury trial on the forfeiture of said assets, and waive[d] all constitutional, legal and equitable defenses to the forfeiture of said assets[.]" *Id.* ¶ 12.

The Court sentenced Vasquez to 16 months' imprisonment, one years of supervised release, forfeiture of $360,000 and assets in two bank accounts, and a $100 special assessment. Final judgment against Vasquez was entered on October 28, 2022. *See* ECF No. 1839; *see also* ECF No. 1829. Vasquez completed his federal sentence on May 19, 2023.

D. <u>The Petitioners with Trial Convictions Upheld on Appeal: Napout and Marin</u>

Marin was arrested in Switzerland on May 27, 2015, when the original Indictment was unsealed. He was extradited to the United States and arraigned on the Indictment on November 3, 2015. For his part, Napout was arrested in Switzerland on December 3, 2015, when the Superseding Indictment was unsealed. He was transferred to the United States and arraigned on the Superseding Indictment on December 15, 2015.

Trial against Marin and Napout on the Second Superseding Indictment began on November 6, 2017. On December 22, 2017, a jury convicted Marin of racketeering conspiracy, three counts of wire fraud conspiracy, and two counts of money laundering conspiracy, and Napout of racketeering conspiracy and two counts of wire fraud conspiracy. *See* ECF No. 873. In particular, Napout was convicted of (i) racketeering conspiracy (Count One), (ii) wire fraud conspiracy – Copa Libertadores (Count Two), and (iii) wire fraud conspiracy – Copa América (Count Six). Marin was convicted of (i) racketeering conspiracy (Count One), (ii) wire fraud conspiracy – Copa Libertadores (Count Two), (iii) money laundering conspiracy – Copa Libertadores (Count Three), (iv) wire fraud conspiracy – Copa do Brasil (Count Four), (v) wire fraud conspiracy – Copa América (Count Six), and (vi) money laundering conspiracy – Copa América (Count Seven).

On June 22, 2020, the Second Circuit affirmed the convictions. *United States v. Napout*, 963 F.3d 163, 168 (2d Cir. 2020). That case remains good law and is binding precedent over their present petitions.

As to the Copa América scheme, the trial evidence proved the following[1]:

- For more than twenty years, CONMEBOL officials solicited and received bribes and kickbacks from sports marketing executives in connection with the purchase and sale of media and marketing rights for Copa América tournaments organized by CONMEBOL. In particular, beginning with the 1987 edition and continuing thereafter through 2011, co-conspirator and former CONMEBOL president Nicolás Leoz, among others, solicited and received bribe payments from the sports marketing company Traffic in connection with the editions of the Copa América played during that period.

- In or about 2010, CONMEBOL terminated its long-standing relationship with Traffic and sold the rights to future editions of the tournament to Full Play, a sports marketing company owned by co-conspirators Hugo Jinkis and Mariano Jinkis. CONMEBOL and Full Play entered into an agreement pursuant to which Full Play was designated CONMEBOL's exclusive agent for the commercialization of the media and marketing rights to the 2015, 2019, and 2023 editions of the Copa América, among other tournaments (the "2010 agreement"). Hugo Jinkis and Mariano Jinkis agreed to pay bribes to various CONMEBOL officials, including Napout and Manuel Burga, in exchange for CONMEBOL's entry into the 2010 agreement with Full Play.

- In or about 2013, representatives of a consortium of sports marketing companies called Datisa – consisting of Traffic, Full Play, and Torneos – agreed to pay bribes to various CONMEBOL and CONCACAF officials, including Napout and Marin, in exchange for the commercial rights to the 2015, 2019, and 2023 editions of the Copa América, as well as the 2016 Copa América Centenario. This contract harmed CONMEBOL and its ten member associations because, in addition to depriving the organizations of the funds that went to pay bribes, it replaced an agency contract – under which CONMEBOL would receive 75% of the income, less certain expenses – with a long-term contract under which CONMEBOL was paid a fixed amount of $80 million per edition with no mechanism for sharing of profits above that amount even in the event of a significant increase in the value of the rights over the life of the contract.

- The conspiring soccer officials agreed to receive bribes ranging from $300,000 to $3,000,000 for signing the Datisa contract and for each edition of the Copa América tournaments from 2015 through 2023. Based on the applicable contract terms, CONMEBOL was not paid the full amount due for the rights upon the signing of the contract, but rather was to be paid in installments leading up to each of the 2015, 2016, 2019, and 2023 editions of the Copa América. Similarly, the bribe payments to each of the conspiring soccer officials were to be paid in conjunction with the signing of the contract and each subsequent edition of the

[1] These summaries come verbatim or near-verbatim from Napout's and Marin's PSRs, which the Court adopted in relevant part at their sentencing hearings.

tournament. Thus, at the time of the unsealing of the Original Indictment in 2015, only a portion of the contract payments had been made and only a portion of the bribe payments had been completed. Based upon the full amount of the intended bribes within the scope of the jointly undertaken criminal activity for this scheme, the total intended loss for this scheme was $79,300,000, as set forth in the chart below.

| | 2015 Edition | Signature of Contract | 2016 Edition | 2019 Edition | 2023 Edition | TOTAL |
|---|---|---|---|---|---|---|
| Bedoya | $1,000,000 | $1,000,000 | *$1,000,000* | *$1,000,000* | *$1,000,000* | $5,000,000 |
| Burga | $1,000,000 | $1,000,000 | *$1,000,000* | *$1,000,000* | *$1,000,000* | $5,000,000 |
| Chavez | $1,000,000 | $1,000,000 | *$1,000,000* | *$1,000,000* | *$1,000,000* | $5,000,000 |
| Chiriboga | $1,000,000 | $1,000,000 | *$1,000,000* | *$1,000,000* | *$1,000,000* | $5,000,000 |
| Del Nero | *$1,000,000* | $1,500,000 | *$1,500,000* | *$1,500,000* | *$1,500,000* | $7,000,000 |
| Esquivel | $1,000,000 | $1,000,000 | *$1,000,000* | *$1,000,000* | *$1,000,000* | $5,000,000 |
| Figueredo | | $3,000,000 | | | | $3,000,000 |
| Grondona | $3,000,000 | $3,000,000 | | | | $6,000,000 |
| Jadue | | $1,000,000 | *$1,000,000* | *$1,000,000* | *$1,000,000* | $4,000,000 |
| Leoz | $3,000,000 | | | | | $3,000,000 |
| Marin | *$1,000,000* | $1,500,000 | *$1,500,000* | *$1,500,000* | *$1,500,000* | $7,000,000 |
| Meiszner | $300,000 | $500,000 | *$500,000* | *$500,000* | *$500,000* | $2,000,000 |
| **Napout** | $1,000,000 | $1,000,000 | *$3,000,000* | *$3,000,000* | *$3,000,000* | $11,000,000 |
| Teixeira | $1,000,000[1] | | | | | $1,000,000 |
| Webb/Sanz | | *$10,000,000* | | | | $10,000,000 |
| **TOTAL** | $15,300,000 | $26,500,000 | $12,500,000 | $12,500,000 | $12,500,000 | $79,300,000 |

Napout PSR ¶¶ 46-49; Marin PSR ¶¶ 49-52.

As to the Copa Libertadores scheme, the trial evidence proved the following:

- For many years, CONMEBOL officials solicited and received bribes and kickbacks from sports marketing executives in connection with the purchase and sale of sponsorship, media, and marketing rights for Copa Libertadores tournaments organized by CONMEBOL.

- In 2005, Alejandro Burzaco acquired a minority ownership interest in Torneos and began to manage much of the day-to-day operations of the company. Burzaco learned of Torneos's practice of making annual bribe payments to CONMEBOL officials in exchange for their support of T&T Sports Marketing Ltd. ("T&T"), a company part owned by Torneos y Competencias S.A., as the holder of the broadcasting rights to the Copa Libertadores, and helped to continue the practice. Burzaco later agreed to pay and did pay annual bribes to six presidents of the traditionally less-powerful member associations of CONMEBOL (referred to as the "Group of Six"), including Napout, in exchange for their support of T&T as the holder of broadcasting rights to the Copa Libertadores, as well as to two other club tournaments, the Copa Sudamericana and the Recopa

Sudamericana. At various times, Marin, among others, also solicited and received bribes from Burzaco in exchange for his support of T&T as holder of the rights to the Copa Libertadores, among other tournaments. In 2012, Napout, Marin, and their co-conspirators agreed to extend T&T's contract rights through the year 2022 in exchange for annual bribe payments. This contract harmed CONMEBOL and its ten member associations because, in addition to depriving the organizations of the funds that went to pay bribes, it committed CONMEBOL to a set price under a long-term contract despite the fact that the value of rights were expected to rise over time, and without any competitive bidding process or effort to determine the market value for the rights.

- Based on the applicable contract terms, CONMEBOL was not paid the full amount due for the rights upon the signing of the contract, but rather was to be paid in installments leading up to each tournament edition. Similarly, the bribe payments to each of the conspiring soccer officials was to be paid in conjunction with each edition of the tournament. Thus, at the time of the unsealing of the Original Indictment in 2015, only a portion of the contract payments had been made and only a portion of the bribe payments had been completed. Based upon the full amount of the intended bribes within the scope of the jointly undertaken criminal activity for this scheme, the total intended loss for this scheme beginning in 2011 is $73,600,000, as set forth in the table below. The full amount of this intended loss was within the scope of the jointly undertaken criminal activity, in furtherance of that criminal activity, and reasonably foreseeable to Napout (beginning in 2011) and Marin (beginning in 2012). Thus, $73,600,000 is attributable to Napout and $66,800,000 is attributable to Marin, as set forth in the chart below.

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016-2022 (7 editions) | TOTAL |
|---|---|---|---|---|---|---|---|
| Bauza | | | $400,000 | | | | $400,000 |
| Bedoya | $400,000 | $400,000 | $600,000 | $600,000 | $600,000 | *$3,500,000* | $6,100,000 |
| Burga | $400,000 | $400,000 | $600,000 | | | | $1,400,000 |
| Chavez | $400,000 | $400,000 | $600,000 | $400,000 | $500,000 | *$3,500,000* | $5,800,000 |
| Chiriboga | $400,000 | $400,000 | $600,000 | $600,000 | $600,000 | *$3,500,000* | $6,100,000 |
| Deluca | $600,000 | | | | | | $600,000 |
| Del Nero | | $300,000 | $450,000 | $450,000 | *$1,200,000* | *$8,400,000* | $10,800,000 |
| Esquivel | $400,000 | $400,000 | $600,000 | $400,000 | $500,000 | *$3,500,000* | $5,800,000 |
| Figueredo | $600,000 | $600,000 | $1,000,000 | $1,000,000 | $300,000 | | $3,500,000 |
| Grondona | $1,000,000 | $1,200,000 | $1,200,000 | $1,200,000 | | | $4,600,000 |
| Jadue | | | $400,000 | $400,000 | $500,000 | *$3,500,000* | $4,800,000 |
| Leoz | $1,000,000 | $1,000,000 | $1,000,000 | | | | $3,000,000 |
| **Marin** | | $300,000 | $450,000 | $450,000 | | | $1,200,000 |
| Meiszner | | $300,000 | $300,000 | $300,000 | $300,000 | *$2,100,000* | $3,300,000 |
| Napout | $400,000 | $400,000 | $600,000 | $400,000 | $500,000 *$700,000* | *$8,400,000* | $11,400,000 |
| Osuna | $600,000 | $600,000 | $600,000 | | | | $1,800,000 |
| Segura | | | | | $300,000 | *$2,100,000* | $2,400,000 |
| Teixeira | $600,000 | | | | | | $600,000 |
| **TOTAL** | $6,800,000 | $6,700,000 | $9,400,000 | $6,200,000 | $6,000,000 | $38,500,000 | $73,600,000 |

Napout PSR ¶¶ 50-53; Marin PSR ¶¶ 53-56.

As to the Copa do Brasil scheme, the trial evidence proved the following:

- For many years, officials of the CBF solicited and received bribes and kickbacks in connection with the purchase and sale of media and marketing rights for the Copa do Brasil club tournament organized by the CBF. In particular, between 1990 and 2009, Traffic entered into a series of contracts with the CBF to acquire the commercial rights associated with the Copa do Brasil. During this period, Ricardo Teixeira – the long-time president of the CBF and a member of the FIFA executive committee – solicited and received bribes from José Hawilla, the owner of Traffic, in connection with the sale of the Copa do Brasil media rights.

- In 2011, another sports marketing company, Klefer Produções e Promoções Ltda. ("Klefer"), entered into a contract with the CBF to purchase the commercial rights for all editions of the Copa do Brasil between 2015 and 2022. In order to secure the contract with the CBF, the company agreed to pay an annual bribe to Teixeira, as Hawilla had done in the past.

- In 2012, Traffic entered into a contract with Klefer to pool their marketing rights for future editions of the Copa do Brasil, from 2013 to 2022, to share in the profits, and to share the cost of the bribe payments to be distributed among Teixeira, Marin, who became the president of the CBF in 2012, and Marco Polo Del Nero, who was elected by the CBF in 2014 to take over as Marin's successor in 2015.

- In connection with the Copa do Brasil Scheme, Teixeira received 1,000,000 Brazilian Reais per year and Marin and Del Nero each received 500,000 Brazilian Reais per year. These payments were to extend at least through the life of the contract, namely, from 2013 through 2022. This contract harmed the CBF in that it deprived the CBF of the funds used for bribes and locked the CBF into a long-term contract without a market valuation or a competitive bidding process. On or about January 1, 2014, one U.S. dollar was equivalent to approximately 2.36 Brazilian Reais. Thus, the annual total bribe payments to Teixeira, Marin, and Del Nero were approximately 2,000,000 Reais, or $847,458.

- Based on the applicable contract terms, the CBF was not paid the full amount due for the rights upon the signing of the contract, but rather was to be paid in installments leading up to each tournament edition. Similarly, the bribe payments to each of the conspiring soccer officials was to be paid in conjunction with each edition of the tournament. Thus, at the time of the unsealing of the Original Indictment in 2015, only a portion of the contract payments had been made and only a portion of the bribe payments had been completed. Beginning in 2013 and extending through the end of the contract in 2022, the intended bribe payments to Teixeira, Marin, and Del Nero in connection with the Copa do Brasil Scheme totaled $8,474,580, all of which was within the scope of the jointly undertaken criminal activity, in furtherance of that criminal activity, and

> reasonably foreseeable to Marin. By the time of his arrest in 2015, Marin had received bribe payments for three editions of the Copa do Brazil, or $1,500,000 Reais, which is equivalent to approximately $635,593.

Marin PSR ¶¶ 54-58.

As to the racketeering conspiracy, the petitioners' schemes did not occur in isolation, but rather were part of the larger pattern of racketeering activity, including the following:

- *The petitioners participated in the purchase and sale of certain media and marketing rights held by CONCACAF to various competitions, including the Gold Cup and the CONCACAF Champions League*: A few years after Traffic began paying bribes to CONMEBOL officials in connection with the Copa América, Traffic's Miami-based affiliate, known as Traffic USA, entered into a similar scheme with CONCACAF officials in connection with CONCACAF's analogue to the Copa América: the Gold Cup. Full Play again followed Traffic and, when it sought to win business with CONCACAF, which had not historically sold media and marketing rights to Full Play, Full Play paid bribes to three CONCACAF officials in exchange for their agreement to use their influence to try to cause CONCACAF to sell to Full Play media and marketing rights for CONCACAF tournaments, including the Gold Cup. This effort was unsuccessful, however, and Traffic USA secured the rights for the later period by bribing a different CONCACAF official.

- *The purchase and sale of certain media and marketing rights to (1) World Cup Qualifier matches held by certain national federations, including the Bolivian, Venezuelan, Ecuadoran, and Argentine federations, the member federations of the Caribbean Football Union (the "CFU"), and certain Central American federations, and (2) friendly matches held by certain national federations, including matches played by the national teams of Argentina, Brazil, Bolivia, Ecuador, Colombia, Chile, and certain Central American federations*: In both the CONMEBOL and CONCACAF regions, the sports marketing companies sought to gain influence over federation presidents by paying bribes and kickbacks in connection with World Cup Qualifier matches and/or friendly matches. Some of the same companies, including Full Play and Torneos, paid these bribes and kickbacks in exchange for the loyalty of the soccer officials, not only with regard to the transfer of the rights to the specific matches, but also in connection with the sale of the rights to the Copa América, Copa Libertadores, and other tournaments.

- *The offer, solicitation, and receipt of bribes and kickbacks in connection with certain broadcast rights and/or the site selection for certain competitions organized by FIFA, and sponsorship rights for footwear, apparel, accessories, and equipment*: Throughout the period during which co-conspirator soccer officials were receiving bribes in connection with the media rights to the tournaments and matches described above, some of the same officials were

> offered and received bribes in connection with FIFA competitions, including the World Cup and the Club World Championship (now known as the Club World Cup), while others solicited and were offered bribes in connection with federation sponsorship rights.

Napout PSR ¶¶ 62-65; Marin PSR ¶¶ 65-68.

The Court adopted the PSRs in relevant part, which included all the facts above. Aug. 22, 2018 Marin Sent. Tr. 28:3-6 ("I adopt the presentence report and the addendum except for those couple of corrections that I just noted in paragraphs 73 and 133."); Aug. 29, 2018 Napout Sent. Tr. 106:23-24 ("I am adopting the presentence report and addendum in full."). The Court sentenced Napout to concurrent terms of 108 months' imprisonment, two years of supervised release, a $1,000,000 fine, forfeiture of $3,347,025.88, restitution of $2,497,151.11, and a $300 special assessment. Final judgment as to Napout was entered on September 4, 2018. *See* ECF No. 1008; *see also* ECF Nos. 1010, 1084, 1145. The Court sentenced Marin to concurrent terms of 48 months' imprisonment, two years of supervised release, a $1,200,000 fine, forfeiture of $3,335,593, restitution of $2,278,315.59, and a $600 special assessment. Final judgment was entered on September 11, 2018. *See* ECF No. 1015; *see also* ECF Nos. 1024, 1084, 1145.

The Court granted Marin compassionate release on consent in 2020 during the Covid-19 crisis, and Marin served approximately two years in prison for his crimes. The Court granted compassionate release to Napout in July 2023 on account of various medical ailments. Napout served approximately five years in prison for his crimes.

Marin died on July 20, 2025. Counsel did not alert the Court of this fact until May 22, 2026, three days after the government learned of Marin's death and contacted counsel. On May 19, 2026, counsel for Marin confirmed to the government via phone call that he had learned of Marin's death months earlier, although he continued to file, and authorized other attorneys to file, letters with the Court on behalf of Marin that did not disclose his death. *E.g.*, ECF No. 2098 (letter from Marin's counsel filed on May 13, 2026, stating, "We write on behalf of defendants Jose Maria Marin and Juan Angel Napout . . ."); ECF No. 2089 (letter filed on March 19, 2026 by counsel for Hawit on behalf of Marin and others). At the government's prompting, counsel filed a letter alerting the Court to Marin's death. ECF No. 2101. In that letter, counsel also requested to substitute in Marin's estate as the *coram nobis* petitioner. *Id.*

### E. The Court's Rule 29 Decision and the *Coram Nobis* Petitions

In 2023, the Court presided over a second FIFA-related trial. On March 9, 2023, the jury convicted former Fox media executive Hernan Lopez of wire fraud and money laundering conspiracies in connection with the Copa Libertadores scheme described above, and Argentine sports marketing company Full Play Group, S.A. ("Full Play") of wire fraud and money laundering conspiracies in connection with the Copa Libertadores scheme, the Copa América scheme, and a scheme involving the media rights for World Cup qualifier and friendly matches for various South American countries' national teams. *See* ECF No. 1964.

A couple of months after trial, on May 11, 2023, the Supreme Court issued *Ciminelli v. United States*, 598 U.S. 306 (2023), and *Percoco v. United States*, 598 U.S. 319 (2023). On September 1, 2023, the Court vacated the convictions, holding that the "scope" of the honest-services fraud statute, 18 U.S.C. § 1346 (referred to herein as "§ 1346"), "does not extend to foreign commercial bribery"—*i.e.*, bribes that sought to taint a foreign fiduciary relationship (in contrast with a U.S.-based fiduciary relationship)—on the basis of those "intervening Supreme Court decisions." *United States v. Full Play Grp., S.A.*, 690 F. Supp. 3d 5, 8, 24-25 (E.D.N.Y. 2023) (referred to herein as the "September 2023 Order"); *see also* ECF No. 2023 at 2, 29. The government appealed the decision on September 22, 2023. *See United States v. Lopez*, No. 23-7183 (2d Cir.).

Napout filed his instant petition on November 22, 2023. Marin filed his instant petition on December 14, 2023. Hawit filed his instant petition on December 28, 2023. Li filed his instant petition on January 30, 2024. The Court deferred ruling on the petitions until final decision of the *Lopez* appeal. *See* Dec. 1, 2023 Order; Dec. 18, 2023 Order; Jan. 5, 2024 Order; Jan. 31, 2024 Order. On December 2, 2024, Marin filed a letter request, in light of his receiving "end-of-life care," seeking resolution of his petition or a declaration that his estate has standing to pursue the petition in the event of his death. ECF No. 2050. The Court denied the request, holding that outcome of the *Lopez* appeal still would "undoubtedly have bearing" on all the petitions and the issue of his estate's standing was unripe. Dec. 9, 2024 Order.

On July 2, 2025, the Second Circuit vacated the decision, holding that neither *Ciminelli* nor *Percoco* "controls this case," and that "the schemes at issue here fall under" § 1346. *See generally Lopez*, 143 F.4th 99. On July 10, 2025, the Court reinstated the verdicts and granted a request by Hawit and Li to defer consideration of the petitions until resolution of any petitions for writ of certiorari. *See* July 10, 2025 Orders.

On September 30, 2025, Lopez and Full Play filed such petitions. Rather than respond to the petitions on the merits, the Department of Justice "determined that it will not commit further resources to these two defendants' [Lopez and Full Play] convictions in this case . . . ." ECF No. 2076 at 2. The Department of Justice thus consented to the grant of the petition for certiorari on the basis that it had filed a dismissal motion before this Court. *Id.* At no point did the Department confess error. *Id.* at 3. Nor was there a merits determination.

The Supreme Court granted the certiorari petitions, vacated the Second Circuit's judgment, and remanded to the Second Circuit for further consideration in light of the pending dismissal motion. *See* Order, *Full Play Grp., S.A. v. United States*, No. 25-390 (U.S. filed Jan. 12, 2026). In response, on January 23, 2026, the Second Circuit recalled the mandate and remanded the case to this Court in light of the motion. *See* ECF Nos. 2072-73.

On remand, the Court ordered supplemental briefing on the motion, including on "whether, and to what extent, the Court may consider" the Second Circuit's vacated *Lopez* opinion, and "the impact, if any," of the dismissal "on the convictions of the other defendants convicted of honest services wire fraud crimes." Jan. 30, 2026 Scheduling Order. In a March 12, 2026 response, the government noted that it "has not confessed error"; that, "as with any non-binding authority, the Court may reflect on the Second Circuit's reasoning but may not rely on it as precedential"; that the dismissal "has no legal effect on other defendants' final

convictions"; and that every defendant "has his own particular facts and circumstances." ECF No. 2076 at 3-4. On March 19, 2026, Hawit filed a letter "on behalf of" all four *coram nobis* petitioners (Napout, Marin, Li, and himself), asserting—incorrectly—that the Department of Justice has "determined" that the Supreme Court would "side" with the Court's September 2023 Order in *Full Play Group*, and that granting the dismissal motion would apply "equally to the Petitioners' cases." ECF No. 2089 at 1-2.

On May 27, 2026, and after hearing oral argument, the Court granted the government's motion. *See* May 27, 2026 Minute Entry. The Court noted that it was "not basing this decision in any way on [its] prior Rule 29 decision or the reasoning in that decision," "the Second Circuit's reversal of that decision," "the Supreme Court's vacating of the Second Circuit's decision," or the suggestion that the "Supreme Court would endorse my Rule 29 decision or reasoning." May 27, 2026 H'rg Tr. 13-14, ECF No. 2107.

On June 12, 2026, the Court issued a scheduling order, granting leave for supplemental briefing in support of the petitions by July 13, 2026. *See* June 12, 2026 Scheduling Order. Relevant here, in the supplemental briefing, Marin's former counsel filed a motion to substitute Marin with his estate under Rule 25(a)(1) of the Federal Rules of Civil Procedure. Vasquez also filed his instant petition on July 13, 2026. The Court directed a response to the petitions by today.

## II. Legal Standard for Writs of Error *Coram Nobis*

The writ of error *coram nobis* is available in federal criminal cases under the All Writs Act. 28 U.S.C. § 1651. "The writ of error *coram nobis* is an extraordinary remedy that issues only in extreme cases." *United States v. Rutigliano*, 887 F.3d 98, 108 (2d Cir. 2018) (citation and quotation marks omitted). It is "a remedy of last resort" that provides a means for an individual who is no longer in custody to collaterally attack his criminal conviction, and that is "strictly limited to those cases in which errors of the most fundamental character have rendered the proceeding itself irregular and invalid." *Id.* (citation and quotation marks omitted); *see also United States v. Denedo*, 556 U.S. 904, 911 (2009) (limiting writ to "'extraordinary' cases presenting circumstances compelling its use 'to achieve justice'" (quoting *United States v. Morgan*, 346 U.S. 502, 511 (1954))). The Supreme Court has observed that "it is difficult to conceive of a situation in a federal criminal case today where [a writ of *coram nobis*] would be necessary or appropriate." *Carlisle v. United States*, 517 U.S. 416, 429 (1996) (citation and quotation marks omitted).

The petitioner's "burden is a heavy one" because the Court "must presume that the proceedings were correct." *Rutigliano*, 887 F.3d at 108 (citation and quotation marks omitted). The standard must be high because "the unlikelihood of retrial would render issuance of the writ the practical equivalent of an acquittal." *United States v. Keogh*, 440 F.2d 737, 741 (2d Cir. 1971) (Friendly, J.); *see also United States v. Keogh*, 391 F.2d 138, 146 (2d Cir. 1968) (Friendly, J.) ("In seeking a workable solution courts must consider not only the maximizing of protection to convicted defendants but the avoidance of impossible burdens on prosecutors and the need to preserve the finality of convictions rendered after trials as nearly faultless as human frailties will permit."). And even where feasible, a retrial

> imposes significant "social costs," including the expenditure of additional time and resources of all the parties involved, the "erosion of memory" and "dispersion of witnesses" that accompany the passage of time and make obtaining convictions on retrial more difficult, and the frustration of "society's interest in the prompt administration of justice."

*Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *United States v. Mechanik*, 475 U.S. 66, 72 (1986)).

Thus, the Second Circuit has translated this demanding standard into a binding three-part test. A petitioner must demonstrate that "(1) there are circumstances compelling such action to achieve justice, (2) sound reasons exist for failure to seek appropriate earlier relief, and (3) the petitioner continues to suffer legal consequences from his conviction that may be remedied by granting of the writ." *Rutigliano*, 88 F.3d at 108. The second and third elements "relate more to the standing of the petitioner to invoke the writ." *United States v. Foont*, 901 F. Supp. 729, 733 (S.D.N.Y. 1995), *aff'd*, 93 F.3d 76 (2d Cir. 1996). Thus, they are the "threshold" elements to decide first before proceeding to the first element. *See id.* at 732-33 (discussing *Nicks v. United States*, 955 F.2d 161, 167-68 (2d Cir. 1992)).

With respect to the first prong, to the extent courts find it satisfied, it is typically where there is clear Supreme Court or Circuit precedent revealing substantial constitutional errors or invalidating the legal theory on which the defendant was convicted.[2] *E.g.*, *Johnson v. United States*, 144 F.4th 133, 143 (2d Cir. 2025) (first prong satisfied where defendant convicted on right-to-control theory, which the Supreme Court expressly repudiated in 2023 in *Ciminelli*); *United States v. Britt*, No. 18-CR-36 (JPO), 2024 WL 168333, at *1 (S.D.N.Y. Jan. 16, 2024) (granting *coram nobis* on consent following Supreme Court decision in *Kelly v. United States*, 590 U.S. 391 (2020), and *United States v. Blaszczak*, 56 F.4th 230 (2d Cir. 2022), which concluded that intangible regulatory information is not property within meaning of wire fraud statute); *United States v. Hernandez*, 283 F. Supp. 3d 144, 149 (S.D.N.Y. 2018) (granting writ on basis of ineffective assistance of counsel where counsel failed to advise a defendant of immigration consequences of a guilty plea, as required under Supreme Court precedent). The government has not identified any cases in which the first prong was satisfied based on a district court decision interpreting an extension of Supreme Court law in the absence of other squarely controlling precedential authority.

Even in *coram nobis* petitions, federal courts ordinarily subject errors to "harmlessness review." *Johnson*, 144 F.4th at 142-43. The appropriate prejudice standard will vary depending on the claim. *See, e.g.*, *du Purton v. United States*, 891 F.3d 437, 440 (2d Cir. 2018) (per curiam) (considering whether "a conscientious juror" "would probably have" acquitted); *see also Brooks v. United States*, No. 94-CR-729 (PKC), 2023 WL 3819374, at *5-6 (E.D.N.Y. June 5, 2023) (applying different prejudice standards for each *coram nobis*

---

[2] *See United States v. Mandanici*, 205 F.3d 519, 531 (2d Cir. 2000) ("The framework established by the Supreme Court in *Teague v. Lane*, 489 U.S. 288 (1989) [to determine when a new rule applies retroactively] applies to petitions for a writ of error *coram nobis*.").

claim). Without a substantial showing of prejudice, a petitioner has failed to show that his errors are "of the most fundamental character, that is, such as rendered the proceeding itself irregular and invalid." *United States v. Addonizio*, 442 U.S. 178, 186 (1979) (quoting *United States v. Mayer*, 235 U.S. 55, 69 (1914)); *cf. Wainwright v. Sykes*, 433 U.S. 72, 91 (1977) (employing prejudice analysis to ensure that federal courts on collateral review are limiting adjudications to "miscarriage[s] of justice").

With respect to the second prong, "a petition for writ of *coram nobis* must be rejected if the claim was raised or *could have been raised* on direct appeal, through a § 2255 motion, or in any other prior collateral attack on the conviction or sentence." *United States v. Miles*, 923 F.3d 798, 804 (10th Cir. 2019) (emphasis added) (collecting cases, including *United States v. Tarango*, 670 F. App'x 981 (10th Cir. 2016) (Gorsuch, J.)); *United States v. Petlechkov*, 72 F.4th 699, 708 (6th Cir. 2023) ("[C]laims that could have been raised on direct appeal or in habeas don't qualify [as cognizable grounds for relief]."); *Hager v. United States*, 993 F.2d 4, 5 (1st Cir. 1993) (Breyer, C.J.) (faulting petitioner for failing to "pursue a timely appeal"). Even a "wall of precedent" against a claim is insufficient justify the failure to raise the claim at an earlier proceeding. *United States v. De Castro*, 49 F.4th 836, 845-46 (3d Cir. 2022); *accord Alikhani v. United States*, 200 F.3d 732, 734 (11th Cir. 2000) (per curiam) (deeming "not cognizable" on *coram nobis* review claims that petitioner "could have, but failed to, pursue" in "pretrial motion"). And certainly "a lack of clarity in the law is not itself a valid reason." *United States v. Kroytor*, 977 F.3d 957, 962 (9th Cir. 2020). Furthermore, the government's interests need not be "prejudiced by" a petitioner's delay. *Foont v. United States*, 93 F.3d 76, 80 (2d Cir. 1996).

With respect to the third prong, a petitioner must "identify a concrete and serious continuing legal consequence of his conviction." *Fleming v. United States*, 146 F.3d 88, 91 n.3 (2d Cir. 1998) (per curiam). The requirement demands more than speculative harm. *Id.* at 91. In *Fleming*, the Second Circuit held that mere speculation that a conviction might disqualify a petitioner from future employment as a securities broker was insufficient. *Id.* The court further emphasized that the "mere 'desire to be rid of the stigma' of a conviction is not enough." *Id.* at 90 (internal citation and quotation marks omitted). Similarly, in *Porcelli v. United States*, the Second Circuit reiterated that the petitioner must show "a concrete threat of serious harm." 404 F.3d 157, 158 (2d Cir. 2005). The disability also must have an effect on the petitioner's "present legal rights." *United States v. Roth*, 283 F.2d 765, 766 (2d Cir. 1960) (per curiam). Furthermore, the "disability must arise out of the erroneous conviction." *United States v. Craig*, 907 F.2d 653, 658 (7th Cir. 1990), *cited in Fleming*, 146 F.3d at 91.

## III. Argument

### A. Summary of Argument

The petitioners principally contend that they deserve *coram nobis* relief because of this Court's September 2023 Order, which held that *Ciminelli* and *Percoco* compelled a conclusion that the honest-services wire fraud statute does not reach foreign commercial bribery, *i.e.*, bribery of an individual whose relationship of trust with their principal is not U.S.-based. *See* Napout Br. 1 (contending that order "applies equally" to his conviction); Marin Br. 1 (adopting Napout's brief and citing order); Hawit Br. 8 (invoking order); Li Br. 6-7 (arguing for "same result" as in order); Vasquez Br. 3 (describing order as "law of the case"). The

petitioners, with the exception of Vasquez, asserted these arguments before the Second Circuit reversed the September 2023 Order in July 2025 in *Lopez*, and maintain them now in the face of *Lopez*'s now-persuasive, nonbinding context.

Post-*Lopez*, the petitioners maintain their merits arguments principally on the basis that the Department of Justice's subsequent decision to dismiss the indictment as to Lopez and Full Play indicate—contrary to the record before this Court—that the Department concluded that *Lopez* was wrongly decided by the Second Circuit. *Compare* ECF No. 2089 (petitioners' argument that "[I]t is clear that the Solicitor General's Office evaluated Your Honor's reasoned decision granting a judgment of acquittal, weighed it against the Second Circuit's decision reversing, determined that not only would the Supreme Court side with Your Honor rather than the panel's decision, but might make additional law unfavorable to the government's broad theories, and opted to request vacatur."), *with* ECF No. 2076 ("The Department of Justice has determined that it will not commit further resources to these two defendants' convictions in this case."), *and* May 27, 2026 Tr. (Statement by U.S. Attorney Nocella: "The Department of Justice has decided that it does not want to use its resources to continue to pursue the prosecution of these two unsentenced defendants because it doesn't fit within the Administration's priorities. The Administration has focused on Homeland Security and it[s] law enforcement priorities are focused on matters such as terrorist organizations, both domestic and international, national security threats, narcotics trafficking and human trafficking, and violent gangs.").

For the reasons described below, these bases do not entitle the petitioners to *coram nobis* relief. In the first instance, the Court need not even engage with the merits because threshold matters of waiver, mootness, untimeliness, and lack of continuing consequences merit denial of all the petitions. The Court should deny the petitions on these threshold procedural grounds.

But if it considers the merits, the Court should deny the petitions on those grounds as well, because (i) this Court's analysis extending the reasoning of *Ciminelli* and *Percoco* to the facts of this case does not rise to the level of "circumstances compelling" *coram nobis* "to achieve justice"; (ii) although *Lopez* is nonbinding, it is compelling persuasive authority that the Court should apply here to hold that the petitioners' honest-services convictions remain sound notwithstanding *Ciminelli* and *Percoco*; and (iii) regardless of the Court's analysis of honest-services wire fraud, all of the petitioners' convictions here are supported on alternative legal theories and the petitioners fail to demonstrate prejudice.

### B. Threshold Bases Require the Denial of Vasquez's and Marin's Petitions

#### 1. Vasquez's Plea Agreement Prevents Him from Collaterally Attacking His Conviction

There are several grounds on which to deny all the petitions, but Vasquez's stands alone in one fatal respect: he waived the right to even bring a *coram nobis* petition. By plea agreement, Vasquez agreed not to challenge his conviction in the event the Court imposed a sentence of 46 months' imprisonment or below, which it did. Vasquez Plea Agmt. ¶ 4. He also agreed not to raise any claim on collateral review that the conduct to which he pleaded did not fall within the scope of the statute. *Id.* But in claiming that the honest-services wire fraud

statute does not extend to foreign commercial bribery, that is precisely what he seeks to do here. Vasquez's petition says nothing about the plain terms of his plea agreement, but it is dispositive. He cannot avail himself of *coram nobis* relief.

Indeed, courts within the Second Circuit have extended the general enforceability of appeal and collateral attack waivers to *coram nobis* petitions specifically. In *United States v. Beckish*, the Southern District of New York held that knowing and voluntary "appeal waivers apply to orders of restitution and attempts to collaterally attack sentences through writs of *coram nobis*," and barred the petitioner's *coram nobis* challenge where the waiver was knowing and voluntary. No. 17-CR-569 (ER), 2020 WL 4500178, at *2 (S.D.N.Y. Aug. 5, 2020). So too did the District of Connecticut in *Dressler v. United States*. *See* No. 21-CV-1055 (JCH), 2022 WL 3107313, at *3 (D. Conn. Aug. 4, 2022). And in *United States v. Tyler*, Judge Dearie denied a petition for a writ of *coram nobis* on the grounds that defendant's challenge was foreclosed by "his knowing and voluntary waiver of his right to appeal or otherwise challenge his conviction or sentence . . . as part of his plea agreement." No. 04-CR-1060 (RJD), 2009 WL 1953199, at *1 (E.D.N.Y. July 7, 2009).

Vasquez's claim is foreclosed by his waiver. The inquiry as to him should end there.

2. <u>Marin's Estate Cannot Stand in His Place to Seek *Coram Nobis* Relief</u>

Marin's estate should not be permitted to stand in his shoes to obtain *coram nobis* relief because his petition was mooted by his death. Even assuming the petition was substantively meritorious, which it is not, the weight of authority is strongly against substituting an estate for a deceased *coram nobis* petitioner. Marin's *coram nobis* petition should be denied on this threshold basis alone.

Under Rule 25(a) of the Federal Rules of Civil Procedure, if a party in a civil action "dies and the claim is not extinguished, the court may order substitution of the proper party." Rule 25(a) merely sets forth the mechanism by which civil "parties are to be substituted in federal court" in the event of a death. *Robertson v. Wegmann*, 436 U.S. 584, 587 n.3 (1978) (citation omitted). The Court must separately determine whether the "applicable substantive law" allows "the action to survive a party's death." *Id.* (citation omitted); *see also* Fed. R. Civ. P. 25(a) (requiring claim to be "not extinguished"); *accord Mich. Cent. R. Co. v. Vreeland*, 227 U.S. 59, 67 (1913) ("The question of survival is not one of procedure, 'but one which depends on the substance of the cause of action.'" (quoting *Ex Parte Schreiber*, 110 U.S. 76, 80 (1884)).

Even assuming Marin's estate has complied (or even can comply) with Civil Rule 25(a) in this criminal proceeding,[3] the considerable weight of persuasive authority counsels in

[3] *Coram nobis* petitions are criminal proceedings, *Wall v. Kholi*, 562 U.S. 545, 559-60 (2011) (observing that coram nobis writ—despite being a "means of 'collateral attack'"—"is a step in the criminal case," not a "separate civil proceeding" (quoting *Morgan*, 346 U.S. at 505 n.4, 510-11)), and the Federal Rules of Civil Procedure generally do not govern criminal proceedings, *see, e.g.*, *Cureton v. United States*, No. 16-CR-23 (CBA), 2025 WL 90514, at *1 (E.D.N.Y. Jan. 14, 2025); *United States v. James*, No. 97-CR-185 (LAP), 2018 WL 8996343, at *1 n.1 (S.D.N.Y. Dec. 11, 2018). Otherwise, the instant petitions would fail as a matter of law under Civil Rule 60(e). *See Morgan*, 346 U.S. at 505 n.4; *see also Nicks*, 955 F.2d at 166-67

favor of denying Marin's motion to substitute and resolving Marin's petition on the basis of constitutional or prudential mootness. Mootness is a jurisdictional limitation on the power of federal courts. *Schaeffler v. United States*, 696 F. App'x 542, 543 (2d Cir. 2017). The doctrine of mootness requires a court to dismiss a case "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). "If, as a result of changed circumstances, a case that presented an actual redressable injury at the time it was filed ceases to involve such an injury, it ceases to fall within a federal court's Article III subject matter jurisdiction and must be dismissed for mootness." *Janakievski v. Exec. Dir., Rochester Psych. Ctr.*, 955 F.3d 314, 319 (2d Cir. 2020). Standing, a sister of mootness, is a similar constitutional limitation on the power of federal courts, but it is considered at the outset of a case rather than based on some triggering event. *See U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980) (describing mootness as "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." (quoting Monaghan, Constitutional Adjudication: The Who and When, 82 Yale L.J. 1363, 1384 (1973))).

The question of whether a *coram nobis* petition is mooted by a defendant's death has not been answered by the Second Circuit. Nor has the Second Circuit resolved in a published opinion the similar question of whether a habeas petition is mooted by a defendant's death. But in at least one case, a panel of the Second Circuit summarily dismissed as moot an appeal of a denial of a habeas petition after the petitioner had died while the appeal was pending. *See Bumpus v. Warden*, 426 F. App'x 21, 22 (2d Cir. 2011). Notably, the Ninth Circuit has also mooted a *coram nobis* appeal based on a petitioner's death. *See United States v. Evans*, 60 F. App'x 697, 697-98 (9th Cir. 2003).

Furthermore, every Court of Appeals confronting the issue has held that a habeas petition is mooted by the petitioner's death. *See Keitel v. Mazurkiewicz*, 729 F.3d 278, 280 (3d Cir. 2013) ("[W]e conclude that Keitel's habeas petition has been rendered moot by his death."); *Bruno v. Sec'y, Fla. Dep't of Corr.*, 700 F.3d 445, 445 (11th Cir. 2012) (per curiam) ("The death of the habeas petitioner renders a habeas action moot."); *Garceau v. Woodford*, 399 F.3d 1101, 1101 (9th Cir. 2005) ("Because petitioner's death renders this case moot, the petition for a writ of habeas corpus should be dismissed as moot."); *McMillin v. Bowersox*, 102 F.3d 987, 987 (8th Cir. 1996) (per curiam); *McClendon v. Trigg*, 79 F.3d 557, 559 (7th Cir. 1996); *Knapp v. Baker*, 509 F.2d 922, 922 (5th Cir. 1975) (per curiam) ("Knapp died on December 20, 1974. This case is therefore moot."). These decisions are also in line with dicta from the Supreme Court and the Second Circuit. *See Lockhart v. McCree*, 476 U.S. 162, 168 n.2 (1986) ("James Grigsby, the habeas petitioner with whose case McCree's had been consolidated, died prior to the District Court's decision, so his case became moot."); *Krantz v. United States*, 224 F.3d 125, 127 (2d Cir. 2000) (per curiam) (noting that the court did "not disagree" with the practice of sister circuits treating a habeas petition as moot after the movant's death).

---

(observing that coram nobis writ has survived only "as a remedy in criminal cases"). Marin's estate thus fails to identify a procedural right to substitution under the Criminal Rules or any other applicable law.

Beyond Article III, the Seventh Circuit has held that the estate of a deceased *coram nobis* petitioner lacks prudential standing to pursue the writ. *United States v. Kerner*, 895 F.2d 1159, 1162 (7th Cir. 1990). In considering the question of whether a decedent's estate had standing to bring a *coram nobis* petition after the Supreme Court invalidated the legal theory on which the decedent was convicted, the Seventh Circuit held that "the interest sought to be protected by the complainant" was not "within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Id.* at 1162 (internal citation omitted). "The narrow 'zone of interests' protected by the writ [of *coram nobis*] includes only the petitioner's right to be free of any lingering civil disabilities remaining from his arguably wrongful conviction," which, the Seventh Circuit held, is a "personal" interest that "cannot survive his death." *Id.* at 1163. To hold otherwise would leave open the possibility of far-flung estates petitioning for *coram nobis* relief on behalf of relatives who have long since passed away, threatening "finality and the promotion of judicial economy." *Id.* at 1161. The estate, therefore, lacked standing to pursue the writ.

The Seventh Circuit reached a similar result in *Craig*, 907 F.2d 653. There, the decedent's conviction had also been extinguished by new Supreme Court law. The estate in *Craig* attempted to distinguish *Kerner* and seek *coram nobis* on the grounds that the exonerated decedent's widow was still alive and would be entitled to pension benefits if her husband's conviction was expunged. The Seventh Circuit rejected that argument, holding, "This argument misses the point. By refusing to hear an estate's petition for a writ of error *coram nobis*, *Kerner* implicitly holds that the right to seek the writ belongs to the wrongfully convicted individual and dies with that individual." *Craig*, 907 F.2d at 657.

In the substantial headwinds of these persuasive authorities, Marin's estate relies on *Blanton v. United States*, an unreported case from the Middle District of Tennessee, as support for the argument that Marin's estate should be permitted to stand in Marin's shoes to continue pursuing the petition that Marin filed before his death. No. 3-86-0593 (BB), 1988 WL 182378, at *5 (M.D. Tenn. Jan. 27, 1988) (holding a deceased petitioner's estate could be substituted to pursue writ, which was filed before he died, as petitioner's "claim[s] for a refund of fines [were] not extinguished by his death"). But *Blanton* is nonbinding on this Court, is contrary to existing law in this district, and its reasoning has not been adopted by any circuit that has considered the issue.

*Blanton* involved defendants convicted of mail fraud on a legal theory that was invalidated by a Supreme Court decision. Defendant Hood had filed a *coram nobis* petition but died before the Court had a chance to rule on the petitions. His widow moved to be substituted as a party and sought refund of his criminal fines. Relying on *United States v. Lewis*, 342 F. Supp. 833 (E.D. La. 1972), *aff'd*, 478 F.2d 835 (5th Cir. 1973), which stated that "fairness and equity compel[led]" "full restitution of a fine that was levied pursuant to a conviction based on an unconstitutional law," the district court held that "Hood's claim for a refund of the fines is not moot" notwithstanding that Hood was dead and *Lewis* did not involve a deceased petitioner. *Blanton*, 1988 WL 182378, at *6 (citing *Lewis*, 342 F. Supp. at 836). The court thus substituted Hood's widow without further analysis or explanation.

But *Blanton* stands alone and does not comport with the reasoning of leading Court of Appeals cases or cases in this district. As an initial matter, the Seventh Circuit noted that in *Blanton*, the government "never contested the standing of any of the petitioners," so that issue was not squarely before the [*Blanton*] court." *Kerner*, 895 F.2d at 1163. The Seventh Circuit "easily distinguished" *Blanton* on the grounds that under binding Seventh Circuit law, the repayment of tainted fines was not sufficient to justify granting the writ. *Kerner*, 895 F.2d 1159, 1163 (7th Cir. 1990) (citing *United States v. Keane,* 852 F.2d 199 (7th Cir. 1988) (Easterbrook, J.)); *see also Keane*, 852 F.2d at 203 (observing that the *Lewis* opinion on which *Blanton* relied "did not discuss the propriety" of allowing use of the writ when the only issue at stake was repayment of a fine" and "passing by such a question in silence does not establish a precedent"). The Seventh Circuit also performed a careful analysis of the history and purposes of the writ to determine the interest being vindicated. *Id.* "That interest is personal to [the defendant], and cannot survive his death." *Id.*; *accord Craig*, 907 F.2d at 657. Other federal courts have agreed with the Seventh Circuit.[4] *See Estate of McKinney ex rel. McKinney v. United States*, 71 F.3d 779, 782-83 (9th Cir. 1995); *United States v. Mandel*, 853 F. Supp. 177, 178 (D. Md. 1994). As the Ninth Circuit has observed, it does not matter that any legal consequences remain. The consequences "only demonstrate that the individual continues to be harmed by the conviction; they are not a basis for relief independent of the unlawful conviction." *McKinney*, 71 F.3d at 782.

Courts in this Circuit also have routinely applied the same logic as *Kerner*. *See Porcelli v. United States*, No. 00-CV-2500 (CPS), 2001 WL 34894717, at *4 (E.D.N.Y. July 17, 2001) (paid fine), *aff'd*, 303 F.3d 452 (2d Cir. 2002); *see also Slaine v. United States*, No. 09-CR-1222 (RJS), 2018 WL 8737886, at *5 (S.D.N.Y. Mar. 5, 2018) (Sullivan, J.) (holding that already paid "forfeiture, fine, and special assessment" by petitioner "do not constitute 'continuing' consequences"); *Shen v. United States*, No. 12-CR-68 (DLI), 2022 WL 229371, at *4 (E.D.N.Y. Jan. 26, 2022) (same, for restitution), *aff'd*, No. 22-378, 2023 WL 3830481 (2d Cir. June 6, 2023). The sole case to suggest that Marin's petition is not mooted by his death is thus undergirded by a principle that has been repeatedly rejected by courts in this Circuit and leading *coram nobis* cases.

---

[4] Even if the Court were to hold in some circumstances that an estate may serve as a substitute for a deceased petitioner, Marin's case would not present such an exceptional case. When he was alive, he presented no "supporting affidavits," and the "[a]iry generalities, conclusory assertions and hearsay statements" of the petition's legal brief do not constitute "admissible evidence." *See United States v. Aiello*, 814 F.2d 109, 113-14 (2d Cir. 1987) (discussing evidentiary standards for § 2255 petitions); *cf. Gonzalez v. United States*, 722 F.3d 118, 131 (2d Cir. 2013) (requiring at least "specific facts supported by competent evidence" to warrant further proceedings). Indeed, the Second Circuit has affirmed the denial of a pretrial criminal motion because the defendant relied on an affidavit by a declarant lacking personal knowledge and thus failed to demonstrate Fourth Amendment standing. *See United States v. Guzman Loera*, 24 F.4th 144, 157 (2d Cir. 2022). And the case is analogous because a showing of ongoing legal consequences is akin to demonstrating "standing." *Foont*, 901 F. Supp. at 733.

More fundamentally, as *coram nobis* relief is conferred by the All Writs Act, *see Denedo*, 556 U.S. at 911, and "no specific" federal statute governs the writ's survivability, the Court must apply "principles of the common law," *Sullivan v. Assoc. Billposters & Distribs. of U.S. & Can.*, 6 F.2d 1000, 1004 (2d Cir. 1925). And at common law, a personal claim typically is "extinguished" upon a party's death. *Robertson*, 436 U.S. at 589 (quoting *Moor v. Alameda Cty.*, 411 U.S. 693, 702 n.14 (1973)); *see also Sullivan*, 6 F.2d at 1004 ("The ancient maxim of the common law was 'actio personalis moritur cum persona.'"). It also would be logically inconsistent to hold that death extinguishes an entitlement to habeas or § 2255 relief, *cf.* 28 U.S.C. § 2241(c) (requiring "custody" or appearance in judicial proceeding); *id.* § 2254(a) (requiring "custody"); *id.* § 2255(a) (same), but not *coram nobis* relief. "The harm to" a *coram nobis* petitioner is "much less" than a habeas petitioner or § 2255 movant "and, accordingly, courts are more reluctant to grant relief." *Moskowitz v. United States*, 64 F. Supp. 3d 574, 577-78 (S.D.N.Y. 2014) (collecting cases).

Although Marin's estate invokes fairness and equity as a last resort, those principles do not counsel in favor of allowing his estate to be substituted in for Marin as *coram nobis* petitioner. As demonstrated above, estates of individuals whose convictions were indisputably invalidated by the Supreme Court nevertheless lacked standing to seek writs of *coram nobis*. In contrast to those estates' plights—where there was no question as to the invalidity of the decedent's convictions—Marin's conviction was directly affirmed by the Second Circuit in a case that remains good law, the Second Circuit a year ago affirmed that reasoning (in what is now only persuasive authority, as described further below), and the Supreme Court has not invalidated the theory on which he was convicted. It would not be fair or equitable for the Court to grant Marin's estate more leeway than other courts provided these other estates who had much stronger equitable claims.

Marin's petition seeking an extraordinary remedy that is personal to him was extinguished upon his death. Accordingly, the Court should deny Marin's estate's motion to substitute and dismiss his petition as moot.

### C. All the Petitions Should Be Denied on Other Procedural Grounds

#### 1. None of the Petitions Is Timely

Four petitioners—Napout, Marin, Hawit, and Li—contend that they timely filed petitions months after this Court's September 2023 Order. Vasquez argues that his petition is timely because he filed the petition weeks after being appointed Criminal Justice Act counsel.

But none of the petitions is timely. After a defendant is no longer in custody, even fundamental errors render a conviction merely "voidable, not void, and *coram nobis* relief may be barred by the passage of time." *Foont*, 93 F.3d at 79. No petitioner offers a justification for failing to make this statutory argument on direct appeal or in a § 2255 motion.

The claim was not "so novel that its legal basis is not reasonably available to" the petitioners or their counsel. *United States v. Whitman*, 115 F. Supp. 3d 439, 443 (S.D.N.Y. 2015) (quoting *Reed v. Ross*, 468 U.S. 1, 16 (1984)), *aff'd*, 754 F. App'x 40 (2d Cir. 2018). Instead, a variation of the argument now raised on *coram nobis* relief was first judicially adopted

no later than July 2004, in *United States v. Giffen*, 326 F. Supp. 2d 497 (S.D.N.Y. 2004). *See id.* at 506 ("Congress did not intend that the intangible right to honest services encompass bribery of foreign officials in foreign countries."). This makes the statutory argument decades old. No later precedent repudiated *Giffen*, at most distinguishing it. *See Napout*, 963 F.3d at 184 (observing that *Giffen* is "not . . . directly analogous"); *United States v. Bahel*, 662 F.3d 610, 632 (2d Cir. 2011) (deeming *Giffen* "unhelpful"); *see also Lopez*, 143 F.4th at 112 n.9 (describing *Giffen* as "factually distinguishable"). More generally, there has been no shortage of "criticism in the courts of the formulation of fraud in federal statutes," which should have put the petitioners on notice to make scope-limiting arguments much earlier in the litigation. *Ragbir v. United States*, 950 F.3d 54, 66 (3d Cir. 2020) (collecting cases). Thus, the argument was "notorious and available" to petitioners "in the exercise of due diligence" prior to their convictions. *United States v. O'Brien*, 926 F.3d 57, 83 (2d Cir. 2019) (quoting *Shotwell Mfg. Co. v. United States*, 371 U.S. 341, 363 (1963)). Petitioners "knew or should have known earlier of facts underlying the claim for *coram nobis* relief." *Rodriguez v. United States*, No. 98-CR-764 (MHD), 2012 WL 6082477, at *10 (S.D.N.Y. Dec. 4, 2012) (citation omitted); *accord Foont*, 93 F.3d at 80.

To be clear, the September 2023 Order does not serve as a change in law such that it provides cause for an untimely filing. Numerous Supreme Court and Second Circuits cases have considered intervening changes of law only in the context of binding post-conviction precedential opinions. *See Davis v. United States*, 417 U.S. 333, 342 (1974) (considering relevant Court of Appeals precedent); *United States v. Loschiavo*, 531 F.2d 659, 666 (2d Cir. 1976) (considering Second Circuit precedent); *United States v. Travers*, 514 F.2d 1171, 1172 (2d Cir. 1974) (Friendly, J.) (considering relevant Supreme Court case overturning Second Circuit precedent). Indeed, the petitioner must make a showing that a binding post-conviction precedent has "changed" a holding of a prior binding precedent. *E.g.*, *Whitman*, 115 F. Supp. 3d at 444 & n.5. A district court opinion does not have such force of "law." *See Chin v. United States*, 622 F.2d 1090, 1092 (2d Cir. 1980) (considering only Supreme Court and Second Circuit cases); *see also United States v. Sanin*, 252 F.3d 79, 83-85 (2d Cir. 2001) (similar); *Underwood v. United States*, 15 F.3d 16, 18 (2d Cir. 1993). Accordingly, the September 2023 Order does not demonstrate a change in the law.

*Ciminelli* and *Percoco* do not help petitioners either. Neither Supreme Court case held that foreign commercial bribery is outside the scope of § 1346. This Court relied on those cases as simply "signaling limits on the scope." *Full Play Grp.*, 690 F. Supp. 3d at 8 (September 2023 Order). Thus, *Ciminelli* and *Percoco* "did not provide the basis" for the claim but rather at most "strengthened the argument for it." *Gonzalez v. United States*, 981 F.3d 845, 853-54 (11th Cir. 2020). "Waiting until a claim is more likely to succeed does not justify a delay in filing a *coram nobis* petition." *Id.* (faulting petitioner for raising claim 20 months later); *cf. United States v. Thorn*, 659 F.3d 227, 233 (2d Cir. 2011) ("The futility test to excuse a default is strict: 'the question is not whether subsequent legal developments have made counsel's task easier, but whether at the time of the default the claim was 'available' at all.'" (quoting *Smith v. Murray*, 477 U.S. 527, 537 (1986))).[5] Furthermore, a "voluntary plea of guilty

[5] Thus, *Johnson*, 144 F.4th 133, is inapposite. In *Johnson*, the government did not dispute that the petitioner filed his petition "at his earliest possible opportunity" by challenging

intelligently made in the light of the then applicable law does not become vulnerable because later judicial decisions indicate that the plea rested on a faulty premise." *Brady v. United States*, 397 U.S. 742, 757 (1970); *accord Hinkson v. United States*, No. 21-40174, 2022 WL 686325, at *2 (5th Cir. Mar. 8, 2022).

Admittedly, the Second Circuit allows for imperfect preservation of arguments on direct appeal. *See Loschiavo*, 531 F.2d at 665-67 (petitioner raised claim for first time in certiorari petition); *cf. Travers*, 514 F.2d at 1177 (2d Cir. 1974) (expressly limiting *coram nobis* decision to petitioners who "had gone through the full appellate process"). Anticipating this exception to his default, Napout, joined by Marin, argues that he in fact made the same statutory argument to the Second Circuit on appeal, even if unpreserved before this Court. But Napout misconstrues the record. He and Marin raised different arguments on appeal: (1) that, a statutory matter, § 1346 does not apply extraterritorially; and (2) that, as a constitutional matter, § 1346 was unconstitutionally vague as applied to them. *See Napout*, 963 F.3d at 178, 181 (describing, and rejecting, defendants' statutory and constitutional arguments on appeal); *see also* Napout's Br. 4-5 (discussing issues presented), *United States v. Napout*, 963 F.3d 163 (2d Cir. 2020) (No. 18-2750), ECF No. 107; Marin's Br. 1, 3 n.2 (discussing issues presented and adopting Napout's arguments), *United States v. Napout*, 963 F.3d 163 (2d Cir. 2020) (No. 18-2750), ECF No. 104; *accord Full Play Grp.*, 690 F. Supp. 3d at 28 (September 2023 Order) (discussing arguments raised in *Napout*). And, of course, Hawit, Li, and Vasquez never raised any argument on direct appeal or in a § 2255 motion.

Therefore, none of the petitioners preserved this available argument in prior proceedings. Napout, Marin, and Li raised the argument for the time more than 5 years after their final judgments; Hawit and Vasquez, more than three years.[6] Petitioners provide insufficient justification for their delay in pressing their arguments, and their default is fatal to their petitions. *See, e.g.*, *Cisse v. United States*, 330 F. Supp. 2d 336, 344 (S.D.N.Y. 2004) (faulting petitioner for seeking relief two years after final judgment); *Rodriguez*, 2012 WL 6082477, at *10 (two years).

---

the right-to-control theory in a petition filed 75 days after the issuance of *Ciminelli*, *see id.* at 142 & n.2. But *Johnson* does not control this case, as the *Johnson* petitioner attempted to preserve the right-to-control challenge on direct review, *see* Appellant's Br. 46-47, *United States v. Johnson*, 945 F.3d 606 (2d Cir. 2019) (No. 18-1503), 2018 WL 4191147, and decades of Second Circuit precedent in fact endorsed the right-to-control theory that *Ciminelli* expressly repudiated. Neither *Ciminelli* nor *Percoco* expressly addressed the issue of § 1346's application to foreign commercial bribery.

[6] Vasquez has additional issues regarding his default. He was still federally incarcerated at the time of *Ciminelli* and *Percoco*, and he was on supervised release when the Court issued the September 2023 Order. There is certainly no reason for him to have waited until after he was no longer in custody to make a claim based on that order. *See, e.g.*, *Scanio v. United States*, 37 F.3d 858, 860 (2d Cir. 1994) (holding that supervised release constitutes custody under 28 U.S.C. § 2255).

2. The Petitioners' Convictions Do Not Pose Continuing Legal Harms

The petitioners claim they suffer from continuing adverse legal consequences as a result of their convictions. At the outset, three of the petitioners—Hawit, Vasquez, and Marin—are situated in a way that makes it categorically impossible for them to establish continuing legal consequences. But even on the merits, none of the petitioners has met their burden to show concrete, non-speculative continuing legal consequences.

i. Even with *Coram Nobis* Relief, Hawit and Vasquez Would Face the Same Consequences Because of Their Other Convictions

Hawit asserts that he is continuing to suffer from a lifetime FIFA ban, has been denied access to certain banks, lost health insurance, and cannot travel to the United States. Vasquez asserts that he too has been denied access to certain banks and cannot travel to the United States. He also points to his ongoing forfeiture obligation and reputational damage as additional bases for relief.

Setting aside whether these harms ordinarily constitute legal consequences that can be remedied by a writ of *coram nobis*, these are harms that Hawit and Vasquez will continue to bear even if their RICO convictions are vacated. That is because Hawit was convicted of obstruction of justice conspiracy, and Vasquez was convicted and served five years in prison in El Salvador for an unrelated criminal embezzlement offense around the time he was charged in the instant case.[7] The writ thus cannot serve as a remedy. *See United States v. Rockower*, 171 F.2d 423, 425 (2d Cir. 1948) ("[I]t is not even apparent how wiping out this conviction will particularly benefit this defendant in the light of the number of other convictions recorded against him."); *see also Maye v. United States*, No. 24-10239, 2025 WL 355012, at *6-7 (11th Cir. Jan. 31, 2025). A "single felony conviction supports any civil disabilities." *Craig*, 907 F.2d at 658 n.2 (quoting *Keane*, 852 F.2d at 205); *see also Keane*, 852 F.2d at 205 ("[E]ven one count stating an offense would be the end of things, for a single felony conviction supports any civil disabilities and reputational injury [the petitioner] may have to endure.").

Vasquez does not address the consequences posed by his conviction (in El Salvador), but Hawit does. He principally argues that his obstruction conviction must fall because the "conduct at issue" there "was the very foreign commercial bribery that was [*sic*] been invalidated by this court." Hawit Br. 9. But Hawit's obstructive conduct was not merely foreign commercial bribery. He engaged in witness tampering in the United States and directed a U.S.-based witness to create sham contracts to give to federal law enforcement. Even if the object of the government's underlying investigation is not criminal, a defendant can still commit obstruction of justice by interfering with the government's investigative process. That is precisely what Hawit did here, and his obstructive conduct formed the basis for the sentence he

[7] According to ¶ 59 of his PSR, Vasquez was "arrested in El Salvador in 2015 on unrelated charges. He was convicted of Ongoing Appropriation or Retention of Social Insurance Contributions and sentenced to eight years custody, which was later reduced to five years custody for good behavior."

ultimately received.[8] There is thus no basis to vacate his obstruction conviction. Thus, with the exception of forfeiture,[9] discussed *infra*, Hawit will continue to face the same legal consequences if his other convictions for RICO conspiracy and wire fraud conspiracy were vacated.

ii. The Petitioners Have Not Established That They Suffer from Continuing Legal Consequences

Even if Hawit and Vasquez were able to overcome the hurdles unique to their petitions (and they cannot), the petitioners have not established that they are suffering from continuing legal consequences.

Financial Penalties. Napout, Marin, and Li assert that *coram nobis* relief is necessary so they can recover financial penalties. Previously paid financial penalties do not constitute continuing collateral consequences. *See, e.g.*, *Slaine v. United States*, 09-CR-1222 (RJS), 2018 WL 8737886, at *5 (S.D.N.Y. Mar. 5, 2018) (Sullivan, J.) (finding that full payment of forfeiture, fine, and special assessment does "not constitute 'continuing' consequences"); *Porcelli*, 2001 WL 34894717, at *4 (holding that "past payment in full" of financial penalty "does not present a 'continuing collateral consequence'"); *see also Shen v. United States*, No. 12-CR-68 (DLI), 2022 WL 229371, at *4 (E.D.N.Y. Jan. 26, 2022) (same, for paid restitution), *aff'd*, No. 22-378, 2023 WL 3830481 (2d Cir. June 6, 2023); *Moskowitz*, 64 F. Supp. 3d at 580 (fine). Otherwise, every conviction would be subject to *coram nobis* review; there will always be, for instance, a special assessment. The "continuing legal consequence test" would become "superfluous." *Id.* at 581; *Keane*, 852 F.2d at 203-04 ("Criminal convictions sometimes produce financial penalties and diminish the reputation of the defendant, but these do not entail continuing legal effects of a judgment. . . . [T]he prospect of getting money back is not enough by itself to support belated review.").

Forfeited Assets. Both Vasquez and Hawit cite their ongoing obligation to pay their respective Forfeiture Money Judgments as continuing legal consequences. And, as noted, Li claims he is entitled to *coram nobis* relief based on the government's purported deprivation of his property. All three petitioners overlook the plain terms of the plea agreements, in which they waived any right to challenge forfeiture. Specifically, in Vasquez's plea agreement (at ¶ 12), he "knowingly . . . waive[d] all constitutional, legal, and equitable defenses to the forfeiture of said assets." Elsewhere in his agreement (at ¶ 7), he "consent[ed]" to an order of forfeiture being made final as part of his sentence. Hawit's agreement (at ¶¶ 8 and 14) and Li's

[8] In the alternative, Hawit contends that even if the Court preserves his conviction for obstruction, he would still be entitled to recover what he paid in forfeiture because his forfeiture money judgment was not premised on his obstruction conviction. This argument, however, overlooks that, pursuant to his plea agreement, Hawit waives his right to contest forfeiture. *See infra*.

[9] As Hawit notes, the two predicates for the forfeiture obligation imposed by the Court were RICO conspiracy, in violation of 18 U.S.C. § 1962(d), and wire fraud conspiracy, in violation of 18 U.S.C. § 1349.

agreement (at ¶¶ 8 and 13), contain substantively identical provisions. Thus, even if the Court were to grant *coram nobis* relief, it would not undo the petitioners' plea agreements with the government, which contain binding, valid waivers precluding them from recovering forfeiture.

Reputational Harm. Vasquez and Marin cite reputational harm as an additional continuing legal consequence. At the outset, the notion that Marin's tarnished reputation is a continuing legal consequence that the estate suffers is questionable at best. But even if he were alive, reputational harm is "clearly insufficient to establish continuing legal consequence." *Moskowitz*, 64 F. Supp. 3d at 580 (citing *United States v. Nat'l Plastikwear Fashions, Inc.*, 368 F.2d 845 (2d Cir. 1966) (per curiam)). Nor can they disentangle whether their reputational harm is from the fact of a criminal conviction versus just the public airing of their bribe-taking conduct, irrespective of whether such conduct is criminal. Factually speaking, there is no dispute that each secretly took large bribes while serving in high-level positions of trust, which itself carries reputational harm that does not merit court intervention. Thus, neither Vasquez nor Marin's estate can obtain *coram nobis* relief on this basis.

Loss of Business Opportunities and Banking Relationships. The living petitioners collectively cite the loss of business opportunities as continuing legal consequences they face as a result of their convictions. But being shut out from business opportunities generally does not qualify as a continuing legal consequence because it is too speculative. *See Fleming*, 146 F.3d at 91 (affirming denial of *coram nobis* petition where petitioner asserted he was "'disabled from employment in a variety of financial jobs'"); *Barnetson v. United States*, No. 12-CR-157 (KMW), 2016 WL 3023156, at *3 (S.D.N.Y. May 6, 2016) (holding that suffering "extreme[]" difficulties in raising capital, being denied visa to visit foreign country, and being unable to carry a firearm are insufficient legal consequences to deserve *coram nobis* relief); *Dixon v. United States*, No. 14-CV-960 (KMK), 2015 WL 851794, at *12 (S.D.N.Y. Feb. 27, 2015) (rejecting *coram nobis* relief where petitioner claimed he could not obtain gainful employment); *cf. Foont*, 901 F. Supp. at 734, (distinguishing diminished job prospects from statutory bar preventing employment in a particular industry). Furthermore, although being barred from "*all*" positions in the petitioner's "profession" may suffice, being denied certain jobs he "yearns for" is insufficient because it is not meaningfully different than having a tarnished reputation because of the conviction. *Foont*, 901 F. Supp. at 734 (quoting *United States v. Bush*, 888 F.2d 1145, 1150 (7th Cir. 1989) (Easterbrook, J.)); *see also Bush*, 888 F.2d at 1149 ("Difficulty in obtaining a desirable job is not a legal disability."). No petitioner has demonstrated such a categorical ban from his industry of choice.

To the extent Vasquez and Hawit specifically cite their FIFA bans to suggest those constitute concrete legal impediments that would be redressed with *coram nobis* relief, both consented to those bans in paragraphs 4 and 3(h), respectively, in their plea agreements. Moreover, neither petitioner explains how the issuance of a writ of *coram nobis* would bring them the relief they seek. As an independent body, FIFA's decision to impose bans is a decision it makes alone, and it has imposed bans on individuals who were not convicted of criminal offenses in connection with this case.[10] Thus, any claim that *coram nobis* relief would redress

---

[10] *See. e.g.*, Associated Press, *Peruvian soccer official gets 2nd FIFA life ban for bribes* (Apr. 4, 2023) (describing Burga's lifetime ban from FIFA despite his acquittal at trial),

their FIFA bans is speculative.

The same is true of the petitioners' banking relationships. Napout, Marin, Hawit, and Li assert that they have lost access to certain banking relationships as a result of their convictions. But it is uncertain at best whether banks would restore their relationships with the petitioners. Even if the Court were to grant the petitions, it would not change the highly publicized nature of the petitioners' conduct here: the receipt of substantial bribes, paid through intermediary bank accounts, made possible through sham agreements and other deceptive conduct. Said otherwise, the petitioners' purported legal innocence does not change the fact that they engaged in commercial bribery and laundered those funds though the banking sector—conduct that almost certainly will continue to affect their banking relationships.

Loss of Health Insurance. Hawit asserts that as a result of his conviction, he lost the health insurance he obtained through the Honduras bar association. Setting aside whether he would be able to obtain that insurance if he still stands convicted of obstruction, Hawit has not explained why he has not been able to obtain health insurance elsewhere in Honduras. Nor has he shown that his bar membership would be restored if the writ of *coram nobis* were issued. As explained above, the "disability must arise out of the erroneous conviction." *Craig*, 907 F.2d at 658 (rejecting proposed civil disability where it is based not "solely" on conviction, but also conduct underlying charge, such that petitioner has not shown that disability "would" dissipate if conviction were vacated), *cited in Fleming*, 146 F.3d at 91 (agreeing with Seventh Circuit caselaw). Hawit has not made such a showing.

Restrictions on International Travel. All but Marin[11] cite their inability to travel to the United States and/or internationally as a continuing legal consequence that persists as a result of their conviction. While it is true that the inability to travel may serve a cognizable consequence, *see Johnson*, 144 F.4th at 142; *Kovacs v. United States*, 744 F.3d 44, 49 (2d Cir. 2014), petitioners have not demonstrated that the issuance of a writ of *coram nobis* would necessarily permit them to travel to this country or others. Again, the facts underlying the petitioners' respective convictions—namely, their receipt of significant sums of bribes over multi-year periods—have been widely publicized and will remain so even if they no longer stand convicted of U.S. crimes. Immigration authorities consider all sorts of information in deciding whether or not to grant a visa to someone. Certainly in the United States, immigration authorities focus on conduct, and not necessarily convictions. *See, e.g.*, *Rodriguez*, 2012 WL 6082477, at *11 (faulting petitioner for failing to show how "removal would be a product of his conviction," as opposed to his conduct—that is, his "presence in the country"); *see also United States v. Pena*, No. 00-CR-711 (PGG), 2025 WL 2144791, at *8 (S.D.N.Y. July 29, 2025) (similar, for naturalization issues).

---

https://apnews.com/article/soccer-fifa-bribery-burga-peru-0f04072052aa0e1b263651477ddddd9f (last visited Aug. 12, 2026).

[11] Marin's petition initially described his inability to travel, but, given the supplemental petition filed on July 13, 2026, the government understands that his estate is no longer pressing that point in light of his passing.

D. The Petitioners Cannot Establish Circumstances Compelling *Coram Nobis* Relief to Achieve Justice

Even if the Court concludes that the petitioners are not procedurally barred by threshold issues or by a failure to satisfy the two procedural prongs of the *coram nobis* standard, the Court should deny the petitions on the legal merits. Petitioners fail to satisfy the first prong: "circumstances compelling" *coram nobis* relief "to achieve justice." *Rutigliano*, 88 F.3d at 108.

In other words, petitioners fail on the legal merits, for at least four reasons: (i) the September 23 Order is nonbinding; (ii) this Court's 2023 analysis extending the reasoning of two Supreme Court decisions to new facts is not a change in the law rising to the level of "circumstances compelling" *coram nobis* "to achieve justice"; (iii) although *Lopez* is only persuasive authority, the Court should apply the Second Circuit's reasoning in *Lopez* to confirm the petitioners' honest-services wire fraud convictions on the merits; (iv) even if the Court disagrees with *Lopez*, declines to apply its reasoning, and persists in holding that honest-services wire fraud does not extend to foreign commercial bribery, the Court should deny the petitions on the basis that petitioners suffered no prejudice because all of their convictions are supported on alternative legal theories, including "classic" deprivation-of-money-or-property wire fraud, racketeering, and/or obstruction of justice, and conspiracy to bribe executives of an entity headquartered in the United States.

1. The Court Should Not Rely on its September 2023 Order to Find Compelling Circumstances Here

Setting aside its merits, the September 2023 Order does not give rise to the extraordinary circumstances warranting *coram nobis* relief. As noted, the government is not aware of a single case where the writ's first element was satisfied by a district court decision interpreting an extension of Supreme Court law in the absence of other squarely controlling precedential authority. The September 23 Order, like any district court decision, is nonbinding, even on this Court. *Contra* Vasquez Br. 3 (asserting, without citation to authority, that September 2023 Order is "law of the case"). As a formal matter, the September 2023 Order was vacated following *Lopez*, and this Court reinstated the verdicts prior to the government's dismissal motion. In any event, law of the case "is a discretionary doctrine, and its application within a case depends, in part, on the context in which the court made its first ruling." *Pinyuk v. CBE Group, Inc.*, 561 F. Supp. 3d 334, 338 (E.D.N.Y. 2021) (citing *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) ("The law of the case doctrine is admittedly discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment.")). "[T]he doctrine 'does not rigidly bind a court to its former decisions, but is only addressed to its good sense.'" *Colvin v. Keen*, 900 F.3d 63, 68 (2d Cir. 2018) (quoting *Zdanok v. Glidden Co.*, 327 F.2d 944, 952-53 (2d Cir. 1964)); *see also United States v. Uccio*, 940 F.2d 753, 758-59 (2d Cir. 1991) (affirming district court's decision not to apply law-of-the-case doctrine and reconsider prior ruling).

For the reasons described below, the government respectfully submits that *Lopez* affords the Court an opportunity to reconsider its prior ruling, at least as applied to the petitioners, all of whom are differently situated than the defendants in *Lopez*.

2. The Court Should Instead Adopt the Reasoning of *Lopez*

Although it is not binding precedent, *Lopez* is compelling persuasive authority that should foreclose the grant of *coram nobis* here. The subsequent actions of the Department of Justice in pursuing dismissal and a Grant, Vacate, and Remand, or "GVR," order as to defendants Lopez and Full Play do not negate the strong persuasive value of the Court of Appeals' reasoning in *Lopez*.

i. The *Lopez* GVR Order Was Not a Ruling on the Merits

A GVR order is a procedural tool by which the Supreme Court grants certiorari, vacates the judgment below, and remands to the lower court for further consideration without adjudicating the legal merits of the case. *See* Stephen M. Shapiro et al., *Supreme Court Practice* § 5.12 (11th ed. 2019). In *Lopez*, the Department of Justice requested a GVR order so that the government could pursue dismissal of the counts against Lopez and Full Play under Rule 48(a) of the Federal Rules of Criminal Procedure based on the government's exercise of "prosecutorial discretion." Gov't Br. 3, *Full Play Group, S.A. v. United States*, No. 25-390 (U.S. filed Dec. 9, 2025), 2025 WL 3645624.

After the Supreme Court had granted, vacated, and remanded the case, the Court's order dismissing the indictments as to Lopez and Full Play indicated that the Department of Justice's change in position resulted from a lack of "fit within the Administration's priorities." May 27, 2026 Tr. 6. The Court did not decide the motion based on its interpretation of § 1346, and indeed the Court had previously reinstated the verdicts in light of *Lopez*. The GVR order vacating the Second Circuit's judgment in *Lopez*, and the subsequent dismissal of these indictments, reflect the government's decision to discontinue the case against *those particular* defendants in its discretionary capacity. Those procedural moves do not reflect agreement or disagreement by the Supreme Court with the legal analysis of the Second Circuit, nor does it reflect a concession of legal error by the government. The GVR order thus did not indicate rejection of the Second Circuit's legal analysis on the merits but instead served as a conduit for dismissal at the Department of Justice's request due to its own prosecutorial decision-making. Put another way, the Supreme Court's GVR "expresses no position on the merits." *Kenemore v. Roy*, 690 F.3d 639, 643 (5th Cir. 2012).

ii. A Vacated Second Circuit Opinion Holds Persuasive Value for District Courts Evaluating Applications of the Same Legal Questions

The District Court's dismissal of the cases against Lopez and Full Play applied only to these specific defendants. It did not extend to the prosecutions of other defendants that fall under the broader umbrella of the FIFA investigation. However, unlike the GVR order, the Second Circuit's legal reasoning in *Lopez* remains relevant for these other parties as it pertains to the scope of federal fraud statutes under which they were convicted. While the Second Circuit's specific *judgment* was erased, the panel's *legal reasoning* provides the most recent and relevant analysis of how honest-services wire fraud relates to foreign commercial bribery, and similar fact patterns, in this district.

Though the GVR order negates the binding effect of the lower court's judgment, the Second Circuit has historically treated similarly non-substantive vacated opinions as persuasive. In *Brown v. Kelly*, the Second Circuit acknowledged the continued persuasive authority of a previous decision that had been vacated by the Supreme Court, stating that although the opinion was not "technically binding on [the Court]," they "nonetheless treat[ed] [the opinion] as persuasive authority." 609 F.3d 467, 476-77 (2d Cir. 2010). The Court cited the quality of the legal analysis, thirty years of reliance of lower courts in the Circuit, and the complexity of the legal question addressed. *See id.* at 479. District courts have consistently viewed vacated decisions by GVR order as maintaining persuasive authority. *See, e.g.*, *Sajous v. Decker*, No. 18-CV-2447 (AJN), 2018 WL 2357266, at *6 (S.D.N.Y. May 23, 2018) (Nathan, J.) ("Courts in this district, following the Second Circuit's conclusion in *Brown*, have treated vacated Second Circuit opinions as persuasive—but nonbinding—authority"); *United Nat. Ins. Co. v. Waterfront N.Y. Realty Corp.*, 948 F. Supp. 263, 268 (S.D.N.Y. 1996) (holding that because Second Circuit's prior decision "was not vacated on the merits, it remains strong persuasive authority"); *see also Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578, 586 (S.D.N.Y. 2013) (noting that GVR "does not necessarily imply that the Supreme Court has in mind a different result in the case, nor does it suggest that our prior decision was erroneous").[12] The Second Circuit's opinion in *Lopez* thus retains persuasive authority for courts in the Circuit, even though the Supreme Court's GVR order renders it non-binding.

3. Honest-Services Wire Fraud Encompasses Foreign Commercial Bribery Even After *Ciminelli* and *Percoco*

The government set forth in its briefing before the Second Circuit its arguments for why it believed the Court's grant of Rule 29 dismissals to Lopez and Full Play in the September 2023 Order were error—arguments that were largely adopted by the Circuit in its *Lopez* opinion. *See generally* Gov't Br., *United States v. Lopez*, 143 F.4th 99 (2d Cir. 2025) (No. 23-7183), 2025 WL 3645624. We incorporate those briefs by reference here in full, and, assuming the Court's deep familiarity with the issues, only summarize them briefly here.

*United States v. Rybicki*, 354 F.3d 124, 134-36 (2d Cir. 2003) (en banc), *Skilling v. United States*, 561 U.S. 358 (2010), *Bahel*, 662 F.3d 610, and *Napout*,[13] 963 F.3d 163, are all binding precedent that together stand for the proposition that § 1346 includes within its scope commercial bribes paid in breach of a duty to a foreign organization, including the exact fiduciary relationships at issue in this case grounded in private codes of conduct.

---

[12] Indeed, outside the Second Circuit, some federal courts will deem cases subject to a GVR order as retaining their "precedential weight." *United States v. Adewani*, 467 F.3d 1340, 1342 (D.C. Cir. 2006) (Garland, J.) (citation omitted).

[13] This case denied petitioners Napout and Marin's appeal of their trial convictions, and it is still good law. The Second Circuit was presented the opportunity to revisit it in *Lopez* and declined to do so. That *Napout* is still good law should end the inquiry as to those two petitioners.

The Supreme Court's 2023 decisions in *Percoco* and *Ciminelli* did not abrogate those precedents. Neither opinion disturbed the existing framework governing private fiduciary duties and foreign actors, much less held that § 1346 categorically excluded foreign commercial bribery.

The distinction is critical because in its September 2023 Order holding that honest-services fraud did not encompass foreign commercial bribery, the Court relied on *Percoco* and *Ciminelli* as the sole basis for reversing its earlier rejection of substantially identical arguments made in pretrial motions by Lopez and Full Play in 2021. *See Lopez,* 143 F.4th at 101, 110; *see also Full Play Grp.*, 690 F. Supp. 3d at 10-11 (September 2023 Order). Before trial, the Court had "no trouble rejecting Defendants' . . . vagueness arguments," reasoning that bribery schemes fall within the core of § 1346 under *Skilling* and binding Second Circuit precedent. *Full Play Grp.*, 690 F. Supp. 3d at 11 (September 2023 Order). The Court further recognized that the existence of a fiduciary relationship between an employee and employer is "beyond dispute," and that an employee's violation of that duty through bribery or kickbacks is conduct that § 1346 plainly criminalizes. *See United States v. Full Play Group., S.A.*, No. 15-CR-252 (PKC), 2021 WL 5038765, at *7 (E.D.N.Y. Oct. 29, 2021) (quoting *United States v. Nouri*, 711 F.3d 129, 137 n.1 (2d Cir. 2013)). Yet after *Percoco* and *Ciminelli* were decided, the Court concluded that these opinions "signal[ed] limits on the scope of the honest services fraud statute," which ultimately compelled it to reverse its prior ruling. *Full Play Grp.*, 690 F. Supp. 3d at 8 (September 2023 Order). As the Second Circuit later persuasively observed, federal courts must follow the concrete holdings of controlling cases, rather than extrapolate from "signals" about how the Supreme Court might decide a different case in the future. *See Lopez*, 143 F.4th at 110. Neither case, properly understood, removes foreign commercial bribery from the domain of honest-services fraud.

First, *Ciminelli* does not address honest-services fraud. That decision struck down the Second Circuit's "right-to-control" theory of property fraud under 18 U.S.C. § 1343, a theory concerning what can constitute "property" for purposes of traditional wire fraud. *Ciminelli*, 598 U.S. at 308-09. The opinion rejected the theory because the federal fraud statutes protect traditional property interests, rather than an abstract right to economically valuable information. *See id.* at 312-16. The opinion did not address § 1346 or the kinds of fiduciary relationships that can support honest-services charges.

Second, *Percoco* addressed whether a private citizen who held no formal governmental position could owe a fiduciary duty of honest services to the public. *See* 598 U.S. at 322-23. While *Percoco* rejected an overbroad duty jury instruction that swept in First Amendment-protected lobbying conduct, it also declined to adopt precisely the type of bright-line rule the Court ultimately imposed in this case that excluded certain relationships from the ambit of § 1346. In creating its own bright-line rule excluding foreign commercial bribery from § 1346's reach, the Court understood *Percoco*'s statement that "[t]he intangible right of honest services must be defined with the clarity typical of criminal statutes and should not be held to reach an ill-defined category of circumstances simply because of a smattering of pre-*McNally* decisions"[14] to mean that a significant number of pre-*McNally* cases containing a factual twin

14 As the Court is aware, after the Supreme Court strictly construed the mail and

fiduciary source is required to sustain a charging theory under § 1346. *Id.* at 328-29. But it actually means the converse: A smattering of such cases is not *sufficient* to create honest-services liability in ill-defined circumstances.

The Second Circuit's opinion in *United States v. Avenatti*, 81 F.4th 171 (2d Cir. 2023), which came out two days before the September 2023 Order, confirms this reading of *Ciminelli* and *Percoco*. There, attorney Michael Avenatti sought, on the basis of *Ciminelli* and *Percoco*, to overturn his honest-services wire fraud trial conviction for soliciting a commercial bribe in exchange for finalizing a settlement between his client and an adverse party. The Second Circuit affirmed, finding that *Ciminelli* and *Percoco* "do not pertain" to Avenatti's claims. *Id.* *Ciminelli* "has no bearing on Avenatti's sufficiency challenge" since it addressed "traditional, not honest-services, fraud." *Id.* *Percoco* was deemed inapposite because it addressed public, not commercial, bribery, and because Avenatti "cannot[] argue that he lacked notice that, as an attorney, he owed a fiduciary duty to his client." *Id.* The Second Circuit accordingly cited a post-*McNally* plurality opinion concerning Rule 10b-5 securities fraud, rather than a pre-*McNally* decision. *See id.* (citing *United States v. Chestman*, 947 F.2d 551, 568 (2d Cir. 1991) (en banc) (plurality opinion)); *see also id.* at 198 n.30 (articulating duty based in part on United *States v. Schwarz*, 283 F.3d 76 (2d Cir. 2002), which was a case involving civil rights violations, not honest-services fraud). (Similarly, in discussing fiduciary duties, *Skilling* itself cited to a case outside the honest-services context. *See* 561 U.S. at 407 n.41 (citing securities-law case *Chiarella v. United States*, 445 U.S. 222, 233 (1980), which in turn cited to a legal treatise, *see Chiarella*, 445 U.S. at 228 n.9)).

The Court should thus follow the binding precedent of *Rybicki*, *Skilling*, *Bahel*, *Napout* and *Avenatti* and hold that the petitioners' conduct is within the scope of § 1346.[15]

---

wire fraud statutes as protecting only property rights in *McNally v. United States*, 483 U.S. 350, 356 (1987), Congress passed § 1346 to broaden the "scheme or artifice to defraud" element of these statutes to include those intended to "deprive another of the intangible right of honest services." 18 U.S.C. § 1346.

[15] The government also argued that the Court erred by overturning the Copa América counts against Full Play without any discussion or consideration of the government's evidence that Full Play conspired to bribe the official of a U.S.-based organization in violation of his fiduciary duty to that organization. The trial evidence proved that CONCACAF was based in the United States. Even applying the district court's rule cabining the scope of § 1346, CONCACAF is a domestic organization whose intangible right to honest services from its employees can still be vindicated under § 1346. But the Court, in describing the Copa América scheme charges in its September 2023 Order, omitted that CONCACAF was one of the victims deprived of the right of honest services and that the evidence presented at trial regarding CONCACAF and Full Play's scheme to bribe its top executive using the U.S. financial system. The Second Circuit did not address this in its *Lopez* decision and remanded it back to the district court, which never happened in light of the GVR. The government argues below that the many bribery schemes involving U.S.-based CONCACAF are themselves a basis to deny coram nobis irrespective of the September 2023 Order.

4. *Lopez* Confirmed that § 1346 Encompasses Foreign Commercial Bribery Through an Elements-Based Analysis, Not By Identifying An Identical Factual Precedent

The Second Circuit largely agreed with these arguments and vacated the September 2023 Order. *See, e.g.*, *Lopez*, 143 F.4th at 110-14. That decision has since been vacated as a result of the GVR. But in articulating an erudite, lengthy, fact-intensive, and unanimous legal analysis that respectfully grappled with—and ultimately disagreed with—this Court's September 2023 Order, *Lopez* is persuasive authority that the Court may take into account in reevaluating the government's arguments above while considering whether the petitioners satisfy the extremely high bar of *coram nobis*.

In its persuasive opinion affirming the convictions of the defendants in *Lopez*, the Second Circuit stated that it did "not view precedent as requiring us to find a pre-*McNally* case factually identical to this one to conclude that the conduct here falls under § 1346." 143 F.4th at 111. Although *Skilling* indeed looked to pre-*McNally* cases to identify the *core* conduct and duties encompassed by the statue, "[n]either the Supreme Court nor this court . . . has held that whenever *a specific fact pattern* cannot be located in virtually identical form in pre-*McNally* case law, it is not covered by § 1346." *Id.*

*Percoco* also failed to establish this requirement. *Percoco* cautioned against using a "smattering of pre-*McNally* decisions" to extend § 1346 to an "ill-defined category of circumstances." 598 U.S. at 328-29. But it does not follow that this warning henceforth required that "more than a smattering" of factually parallel historical cases exist before § 1346 could be applied to an otherwise well-established bribery scheme. *Lopez*, 143 F.4th at 111. *Percoco* addressed the creation of an uncertain fiduciary duty category—it did not require a historical factual twin whenever courts apply an already recognized fiduciary relationship and established form of prohibited conduct to different facts. The pertinent question, then, is whether existing precedent had already recognized the fiduciary duty of a private, foreign employment relationship, and whether any facets of the instant fact pattern remove the scheme from the domain of § 1346.

The *Lopez* court described the appropriate methodology to answer this legal question as "dissect[ing] the schemes before us into their salient components and look[ing] at each separately to determine whether any component takes the scheme outside the scope of § 1346." *Id.* Those components included "the conduct at issue; the players involved in the scheme; where the scheme took place; and the nature of the fiduciary duty that was purportedly breached." *Id.* As the Second Circuit concluded, those components "inexorably" demonstrated that the petitioners' schemes fell within the statute. *Id.*

The charged conduct was bribery, which the defendants did not dispute lies at the core of § 1346. *Id.* at 111-12. The fiduciary relationship was an employer-employee relationship, which the panel described as "commonly recognized, including by pre-*McNally* cases, as 'beyond dispute.'" *Id.* at 112 (first quoting *Skilling*, 561 U.S. at 407 n.41, and then quoting *Nouri*, 711 F.3d at 137 n.1). The relevant organizations' code of ethics further imposed express duties of loyalty and prohibited employees from using their positions for personal gain, a relationship constituting a fiduciary duty which does not depend on foreign law. *Id.* at 114-15;

*see Napout*, 963 F.3d at 184-85. Thus, the fiduciary duty was not inferred from a theory of influence and governmental reliance that was rejected by *Percoco*—it instead arose from conventional employment relationships.

Additionally, the foreign identity of the employees and employers did not remove the scheme from the scope of § 1346. As the *Lopez* court explained, *Bahel* already established that § 1346 is not limited by the identity of the actors involved in pre-*McNally* cases. *Id.* at 112. The *Lopez* panel rejected the contention that the organization's headquarters must be in the United States, noting that this detail were merely dictum in the *Bahel* holding. *See id*. It also noted that the District Court had misplaced its reliance on the statement in *Napout* that the question of whether foreign employment relationships were cognizable fiduciary duties under § 1346 was "unsettled, at best." *Id.* at 113 (quoting *Napout*, 963 F.3d at 184). As discussed above, that language arose in the context of plain-error review and did not resolve the legal question on its merits because the *Napout* court was not required to do so based on the posture of the case before it. *Id.* In fact, *Napout* duly recognized that the evidence—millions of dollars of bribe payments flowing through New York bank accounts, and the codes of ethics to which employees of FIFA and CONMEBOL agreed pursuant to their employment by these organizations—were indeed sufficient to uphold their convictions. *See Napout*, 963 F.3d at 184-85.

Because none of the components of the schemes for which the *Lopez* defendants were convicted enlarge § 1346 beyond its established boundaries, the Second Circuit concluded that foreign commercial bribery, as exhibited in the instant case, falls within the statute.

### E. The Petitioners Fail to Demonstrate Prejudice Because There Are Ample Alternative Factual and Legal Bases to Uphold Their Convictions

Even if the Court were to adhere to its views expressed in the September 2023 Order, the Court would not find that these petitioners suffered actual prejudice because their conduct constituted other crimes besides foreign commercial bribery under § 1346.

#### 1. The Prejudice Prong Is a High Standard

As noted about, the petitioners bear a "heavy" burden of demonstrating an entitlement to relief because the Court "must presume that the proceedings were correct." *Rutigliano*, 887 F.3d at 108. In assessing prejudice, the Court may consider, among other things, PSRs, "competent evidence" in the record, "previous proceedings," and the relevant charging instruments. *United States v. Brahms*, 746. F. Supp. 385, 386-87 (S.D.N.Y. 1990), *aff'd*, 932 F.2d 955 (2d Cir. 1991); *see also De Castro*, 49 F.4th at 847-48; *Barnetson*, 2016 WL 3023156, at *2.

The Third Circuit in *De Castro* correctly invoked a requirement that the petitioners show "actual prejudice," a standard that is appropriate for this type of collateral attack. 49 F.4th at 847-48. The "showing of prejudice" required is "significantly greater than that necessary under 'the more vague inquiry suggested by the words 'plain error,'" and the claimed error must have "worked" to the petitioner's "*actual* and substantial disadvantage." *Cf. Murray v. Carrier*, 477 U.S. 478, 493-94 (1986) (discussing petition under 28 U.S.C. § 2254)

(first quoting *Engle v. Isaac*, 456 U.S. 107, 135 (1982), and then quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).

In claiming prejudice, Vasquez cites to *Johnson*, 144 F.4th 133, which is not analogous. *Johnson* involves a constitutional claim under *Yates v. United States*, 354 U.S. 298 (1957), where the district court instructed on an entirely invalidated prosecution theory at trial. But Vasquez never proceeded to trial; even Napout and Marin do not claim that this Court erred in any of its jury instructions. Indeed, the Court was obligated to instruct generally on honest-services fraud, because § 1346 was then, and remains now, constitutional.[16]

The prejudice analysis for the petitioners who did not proceed to trial is especially tough. "Undeniable advantages, such as limiting exposure to punishment, flowed from this decision." *United States v. George*, 676 F.3d 249, 256 (1st Cir. 2012). Even without an agreement, a guilty plea "waived virtually all objections and defenses for purposes of direct appeal," including the opportunity to challenge the "legal definition of honest-services fraud." *Id.* at 256-57. "This decision alone counts against finding an error of the most fundamental character." *Id.* at 257. Furthermore, the "interest of finality" is "of heightened concern when a conviction arises from a guilty plea." *Id.*

Accordingly, if there is at least "some . . . basis for thinking that the [pleading] defendant is at least arguably guilty," relief is not warranted. *Id.* at 257 (alteration in original) (citation omitted). Such a petitioner cannot demonstrate merely that the current "record before [the Court] contains" insufficient evidence of liability; the petitioner must "dispel the obvious concern that the [crime] in which he was involved may have [nonetheless] entailed conduct still criminal" under the caselaw. *Id.* Only the latter showing may overcome the practical reality that "the factual insufficiency about which the petitioner [now] complains may well have resulted from his own decision to minimize his exposure and plead guilty as soon as practicable." *Id.* If the concern remains and the "circumstances" are "uncertain," then the petitioner has not demonstrated "an error of the most fundamental character." *Id.* at 254. Affording *coram nobis* relief in such circumstances would "facilitate a miscarriage of justice," especially when, as here, no one doubts that the conduct "violated the federal fraud statute as its honest services component was understood at the time." *Id.* at 259.

Because none of the petitioners can demonstrate actual prejudice, and because the petitioners committed other crimes well supported in the record, the *coram nobis* petitions fail on the merits.[17] The government addresses arguments shared by all five petitioners below. But to be clear, Hawit especially fails to demonstrate prejudice, as his obstruction of justice conspiracy conviction is entirely unaffected by the legal reasoning of the September 2023 Order.

---

[16] Notably, in *Stinn v. United States*, No. 25-293, an appeal of this Court's denial of a *coram nobis* petition, the Second Circuit heard oral argument and is considering whether to limit *Johnson*'s application in *Yates* claims. To the extent that the Court relies on *Johnson*, it may decide to await further direction from the Second Circuit in *Stinn*.

[17] The petitions also fail on any standard of prejudice.

2. The Racketeering Conspiracy Convictions Are Unaffected Even Under the Reasoning of the September 2023 Order

All of petitioners' racketeering conspiracy convictions survive even under the reasoning of the September 2023 Order. All the petitioners were convicted of a single racketeering conspiracy spanning the globe and including domestic commercial bribery. This conspiracy has been charged since the original Indictment and has always included CONCACAF, a U.S.-based organization. CONCACAF was *headquartered* in the United States throughout the scheme—as CONCACAF confirmed in its letter, *see generally* ECF No. 2092, and Hawit and the two other pleading petitioners expressly allocuted during their plea hearings. There is no genuine debate that CONCACAF was a United States organization for purposes of the fraud statutes. *See, e.g.*, *Bahel*, 662 F.3d at 632 (considering the United Nation's headquarters location); *see also Lopez*, 143 F.4th at 102, 112 ("[T]he victim of the Copa América Centenario scheme, CONCACAF, *is* headquartered in the United States."). Thus, irrespective of the September 2023 Order's analysis with respect to bribery involving Switzerland-based FIFA or Paraguayan-based CONMEBOL, CONCACAF is a domestic entity, and the bribery of its officials falls within the scope of the honest-services statute even under the September 2023 Order's terms.

As a matter of Second Circuit caselaw, a racketeering conspiracy conviction need not be affected simply because some of the contemplated predicate acts may be legally invalid. Racketeering conspiracies do not require an actual pattern of racketeering activity, the commission of or even agreement by any particular defendant to commit (or even facilitate) a racketeering act, or even the existence of an enterprise. *See, e.g.*, *United States v. Capers*, 20 F.4th 105, 117-18 (2d Cir. 2021); *United States v. Delgado*, 972 F.3d 63, 80 (2d Cir. 2020); *United States v. Arrington*, 941 F.3d 24, 36-37 (2d Cir. 2019); *United States v. Zemlyansky*, 908 F.3d 1, 11 (2d Cir. 2018); *United States v. Applins*, 637 F.3d 59, 75 & n.4 (2d Cir. 2011). Instead, the government need show merely an agreement to a "general criminal objective of a jointly undertaken scheme," *Arrington*, 941 F.3d at 36-37; *accord United States v. Pollok*, 139 F.4th 126, 135 (2d Cir. 2025); *Delgado*, 972 F.3d at 79—in other words, a conspiracy to "function as a unit for the common purpose of engaging in racketeering activity," as opposed to a conspiracy to "commit" any particular "predicate acts," *Capers*, 20 F.4th at 118 (first quoting *United States v. White*, 7 F.4th 90, 99 (2d Cir. 2021), and then quoting *United States v. Pizzonia*, 577 F.3d 455, 463 (2d Cir. 2009)). The defendant also need not commit "an overt act." *United States v. Laurent*, 33 F.4th 63, 76 (2d Cir. 2022). Accordingly, the Second Circuit has made clear that a defendant may commit racketeering conspiracy

> simply by sitting around a table and agreeing with other individuals to create an organization *like* [the charged enterprise], that would engage in criminal acts *like* [the charged acts], whether or not the organization ever gets off the ground and whether or not the defendant, or any of his co-conspirators, ever commits any of the anticipated crimes.

*Capers*, 20 F.4th at 118 (emphases added). In addition, where, as here, an actual enterprise already exists, the government need show only that the petitioner "knew what the other conspirators 'were up to,'" or that "the situation would logically lead [the defendant] 'to suspect

he was part of [the] larger enterprise.'" *White*, 7 F.4th at 99 (second alteration in original) (quoting *United States v. Zichettello*, 208 F.3d 72, 99 (2d Cir. 2000)); *accord Delgado*, 972 F.3d at 80 (affirming conviction where defendant "knew about, and agreed to, 'the general criminal objective' of" charged enterprise (quoting *Arrington*, 941 F.3d at 36-37)).

No one has disputed that an enterprise of soccer organizations and sports marketing companies in fact existed during the scheme. Indeed, the three pleading petitioners expressly allocuted to the enterprise's existence, and the jury found an enterprise beyond a reasonable doubt in Napout's and Marin's trial. As the record evidence in this case has showed, the enterprise plainly included decades of bribery involving CONCACAF officials, including but not limited to bribery in connection with multiple editions of the Copa América tournament and with a Copa Ámerica Centenario tournament jointly run by CONCACAF and CONMEBOL. As Napout's and Marin's PSRs make manifest, numerous CONCACAF events were implicated in the racketeering scheme, including the Gold Cup, the CONCACAF Champions League, and CONCACAF-related World Cup qualifiers and friendly matches. The enterprise operated around the world, and many of the members held scheme-related meetings and banked in the United States. Petitioners' actual participation in the enterprise—which included membership in FIFA organizations and the actual and knowing receipt of bribes—certainly creates a "situation" that would "logically lead" them to "suspect" they were part of this larger, global enterprise.[18] *White*, 7 F.4th at 99 (quoting *Zichettello*, 208 F.3d at 99). Even if these five particular petitioners' own bribes were exclusively tethered to foreign fiduciary duties (which the government disputes), those bribes would nonetheless put the petitioners on notice that this agreed-upon global enterprise "would engage in criminal acts like" domestic commercial bribery. *Capers*, 20 F.4th at 118.

Put another way, the massive scope of this scheme leads inevitably to the conclusion that the enterprise's "general criminal objective" was receiving bribes and kickbacks worldwide, including bribes paid to executives of a U.S.-based entity. *Delgado*, 972 F.3d at 80 (quoting *Arrington*, 941 F.3d at 36-37). No jury would find otherwise. And the enterprise embraced much, much more criminality, including other predicate acts that are clearly unaffected by the reasoning in the September 2023 Order: traditional-property fraud (which Li admitted he performed in the form of embezzlement), money laundering, state-law bribery, Travel Act violations, and obstruction of justice (which Hawit admitted he performed).[19] The contemplated enterprise here engaged in copious amounts of criminal activity, implicating numerous federal and state laws, regardless of whether foreign commercial bribery constitutes a violation of one particular statute (§ 1346).

---

[18] As *Lopez* noted, separately from CONCACAF, "the United States Soccer Federation is involved" with "FIFA and CONMEBOL" in numerous ways. 143 F.4th at 112.

[19] Indeed, even in a substantive racketeering charge, it is "the pattern of activity, not the predicates, that is punished." *United States v. Basciano*, 599 F.3d 184, 205 (2d Cir. 2010). Leaving aside honest service wire fraud predicated on foreign commercial bribery does not alter the "common pattern of racketeering" initially charged by the grand jury in the indictments here and demonstrated by both the case record and various proven acts performed by the enterprise's members and associates. *Id.* at 206.

3. The Wire Fraud Conspiracy (and Related Money Laundering Conspiracy) Convictions and Predicate Acts Are Unaffected Even Under the Reasoning of the September 2023 Order

Petitioners also fail to demonstrate that the wire fraud conspiracy (and related money laundering conspiracy) convictions and predicate acts would be affected. As an initial matter, the fraud-related convictions for Hawit, Li, and Vasquez implicated CONCACAF bribery, which does not constitute foreign commercial bribery for the reasons stated above.

As for all five petitioners, the case record shows that they committed, and were indicted on, fraud under a traditional money-or-property theory as well as an honest-services theory. Contemplated economic loss is a mine-run traditional-property theory. And as explained above, testimony and other evidence from both trials established that the petitioners' bribery scheme deprived FIFA and its constituent organizations of money and property in two respects: (1) the total amount in bribes as lost value to the organizations and (2) the suppression of a competitive marketplace for bidders. *See, e.g.*, Napout Trial Tr. 193 (expert witness Stefan Szymanski) ("Q: With respect to the bribe, why do you say that the bribe is money that the soccer organization would have gotten? A: Well, because, ultimately, the buyer the broadcaster, the advertiser, the sponsor, has a budget. If they pay out money in bribes that's money that they would have been willing to allocate to acquire the rights and that's, therefore, money that the soccer organization has lost."); Napout Trial Tr. 198 (Szymanski) ("Q: And you said, I think, that—did you say that the amount of harm would be essentially the amount of the bribe? A: I said that was part of it, actually, but I said there were two parts. The other part was if bribery and corruption is known to be part of the process, then, in fact, the bidders -- some bidders might be scared off the process entirely and, in fact, the harm could be much greater."); Lopez Trial Tr. 4738 (co-conspirator and soccer executive Luis Bedoya) (testimony that Paco Casal made higher offer to CONMEBOL for Copa Libertadores than co-conspirator Alejandro Burzaco's sports media company TyC, leading local clubs in Uruguay to sue CONMEBOL alleging their clubs had lost money); Lopez Trial Tr. 629 (Burzaco) (testimony that T&T increased size of bribes to CONMEBOL presidents in light of "Burga conversations with Casal to see if he can get more money for the rights"); Lopez Trial Tr. 2113 (Burzaco) ("I was sharing these with . . . the head of ESPN, and who have abstained from competing in these rights knowingly—knowingly, as many people in the media market, although—knowingly that there was a bribe scheme, and it was impossible to enter without paying bribes.").

Beyond the trial testimony, Li himself allocuted to committing embezzlement, which is property fraud, as part of the overarching enterprise. The embezzlement directly victimized FIFA, which provided the funding. Li cannot avoid those facts now. Neither can the other members and associates of his contemplated enterprise, such as the other four *coram nobis* petitioners.

In any event, the Court may consider post-conviction precedents in determining prejudice. *See, e.g.*, *Brown v. Davenport*, 596 U.S. 118, 136, 137 n.3 (2022) (holding that federal courts "may consult and draw on the whole body of law," including "later decided" Supreme Court cases and "circuit case law"). The Supreme Court recently made clear that it is irrelevant whether a victim is "economically worse off" from a property deprivation, and that the

relevant fraud statutes are "agnostic about economic loss." *Kousisis v. United States*, 605 U.S. 114, 118, 120-21, 124 (2025).

Interpreting *Kousisis*, the Second Circuit has explicitly rejected its prior precedents preventing punishment for "schemes that 'do no more than cause their victims to enter into transactions they would otherwise avoid,'" and the Second Circuit now holds that federal fraud may occur "anytime a defendant uses falsehoods to induce a victim to enter into a transaction" that "will cost her money or property" meeting a materiality standard. *United States v. Runner*, 143 F.4th 146, 155-56 (2d Cir. 2025) (first quoting *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007), and then quoting *Kousisis*, 605 U.S. at 122, 135); *see also id.* at 157 n.9 (rejecting argument that prosecution required showing that what victims "received was worth less than what they were promised"). *Ciminelli* "did not discuss, much less reject" wire fraud prosecutions predicated on fraudulent inducement. *Kousisis*, 605 U.S. at 134.

The government need not have shown contemplated economic loss to FIFA and its member associations beyond the deprivation of the media and marketing rights they held as their extremely valuable property (although it did). The co-conspirators here schemed to deprive the organizations of the property rights and hide from the organizations that bribes were being paid to individual executives—facts that were material to the organizations. For instance, FIFA and its constituent organizations were bound by explicit prohibitions against bribery through the codes of ethics; co-conspirators, including Napout, wanted to keep the bribes secret; and Chilean soccer federation president Harold Mayne-Nicholls, one of the CONMEBOL officials who was not bribed, refused to sign Full Play's bribe-induced contract for Copa América rights. *See, e.g.*, Napout Trial Tr. 274, 343-44, 1588-89, 4222; Lopez Trial Tr. 3351, 3353, 3425-26, 4686, 4716-17. Where the fraudster's deception is geared toward "depriving [victims] of information in order to induce [them] to part with" property, as opposed to an "intangible property interest in 'that *information itself*,'" the government has proven a property fraud scheme after *Kousisis*. *United States v. Gentile*, No. 21-CR-54 (RPK), 2025 WL 777090, at *23 (E.D.N.Y. Mar. 11, 2025), *appeal docketed*, No. 25-1262 (2d Cir. filed May 15, 2025). Only the latter implicates *Ciminelli*. *See Kousisis*, 605 U.S. at 134. Because the co-conspirators, including duty-bound executives, were misleading FIFA and its constituent organization into letting go of their lucrative rights without the material information that the rights were being procured through bribery, the co-conspirators committed traditional-property fraud under *Kousisis* and its progeny.

Therefore, even if the Court were to remain convinced that § 1346 does not cover foreign commercial bribery, petitioners here have failed to demonstrate compelling circumstances warranting *coram nobis* relief because the conduct for which they were convicted included a massive racketeering scheme embracing numerous other crimes, such as traditional-property fraud and domestic bribery schemes involving, among other organizations, U.S.-based CONCACAF.

IV. Conclusion

For the foregoing reasons, the Court should deny all the *coram nobis* petitions.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By: /s/
Kaitlin T. Farrell
Victor Zapana
Eric Silverberg
Assistant U.S. Attorneys
(718) 254-7000

cc: Clerk of Court (PKC) (by E-mail)
Counsel of Record (by E-mail)